# BROWN ET AL. *v.* LOUISIANA.

No. 41.   Argued December 6, 1965.—Decided February 23, 1966.

*Carl Rachlin* argued the cause for petitioners. With him on the brief were *Robert F. Collins, Nils R. Douglas, Murphy W. Bell, Floyd McKissick* and *Marvin M. Karpatkin.*

*Richard Kilbourne* argued the cause for respondent. With him on the brief were *Jack P. F. Gremillion,* Attorney General of Louisiana, and *Carroll Buck,* First Assistant Attorney General.

MR. JUSTICE FORTAS announced the judgment of the Court and an opinion in which THE CHIEF JUSTICE and MR. JUSTICE DOUGLAS join.

This is the fourth time in little more than four years that this Court has reviewed convictions by the Louisiana courts for alleged violations, in a civil rights context, of that State's breach of the peace statute. In the three preceding cases the convictions were reversed. *Garner* v. *Louisiana,* 368 U. S. 157, decided in December 1961, involved sit-ins by Negroes at lunch counters catering only to whites. *Taylor* v. *Louisiana,* 370 U. S. 154, decided in June 1962, concerned a sit-in by Negroes in a waiting room at a bus depot, reserved "for whites only." *Cox* v. *Louisiana,* 379 U. S. 536, decided in January 1965, involved the leader of some 2,000 Negroes who demonstrated in the vicinity of a courthouse and jail to protest the arrest of fellow demonstrators. In each of these cases the demonstration was orderly. In each, the purpose of the participants was to protest the denial to Negroes of rights guaranteed them by state and federal constitutions and to petition their governments for redress of grievances. In none was there evidence that the participants planned or intended disorder. In none were there circumstances which might have led to a breach of the peace chargeable to the protesting participants.[1]

---

[1] Participants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence. See *Cox* v. *Louisiana, supra,* at 551–552; *Wright* v. *Georgia,* 373 U. S. 284, 293; cf. *Terminiello* v. *Chicago,* 337 U. S. 1. Compare *Feiner* v. *New York,* 340 U. S. 315, where one speaker was haranguing 75 or 80 "restless" listeners; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568 ("fighting words"); cf. *Niemotko* v. *Maryland,* 340 U. S. 268, 289 (concurring opinion of Frankfurter, J.). See generally on the problem of the "heckler's veto," Kalven, The Negro and the First Amendment, pp. 140–160 (1965).

In *Garner* the Court found the record utterly barren
of evidence to support convictions under Title 14, Ar-
ticle 103 (7) of the Louisiana Criminal Code, which then
defined the crime of "disturbing the peace" in specific
detail.[2] The record contained no evidence of boisterous
or disorderly actions or of "passive conduct likely to
cause a public disturbance." 368 U. S., at 173–174. In
*Taylor,* which arose under the Louisiana statute as
amended to read in its present form, see p. 138, *infra,* the
Court in a *per curiam* opinion set aside the convictions
despite evidence of "restlessness" among the white on-
lookers. Finally, in *Cox,* the Court held that the facts
would not permit application of Louisiana's breach of
the peace statute, despite the large scale of the demon-
strations and the fact that petitioner's speech occasioned
"grumbling" on the part of white onlookers. Petitioner
and the demonstrators as a group, though "well behaved,"
were far from silent, 379 U. S., at 543, 546.[3] As an "addi-

---

[2] The statute then read: "Disturbing the peace is the doing of
any of the following in such a manner as would foreseeably disturb
or alarm the public:

"(1) Engaging in a fistic encounter; or

"(2) Using of any unnecessarily loud, offensive, or insulting lan-
guage; or

"(3) Appearing in an intoxicated condition; or

"(4) Engaging in any act in a violent and tumultuous manner by
any three or more persons; or

"(5) Holding of an unlawful assembly; or

"(6) Interruption of any lawful assembly of people; or

"(7) Commission of any other act in such a manner as to unrea-
sonably disturb or alarm the public."

[3] While it was not disputed that the demonstration was "orderly and
well-controlled," the demonstrators clapped and sang and petitioner
spoke in protest of arrests of certain other civil rights demonstrators.
In addition to the breach of the peace charge, Cox was charged with
obstructing public passageways and with demonstrating near a court-
house. Convictions on these grounds were also reversed. See 379
U. S. 536, 559.

tional reason" why the conviction could not be sustained, the Court, citing *Terminiello* v. *Chicago*, 337 U. S. 1, and *Edwards* v. *South Carolina*, 372 U. S. 229, held that were the statute to be defined and applied as the Louisiana Supreme Court had done, it would be unconstitutional because the vagueness and breadth of the definition "would allow persons to be punished merely for peacefully expressing unpopular views." 379 U. S., at 551. See *Edwards* v. *South Carolina, supra,* at 237.

Since the present case was decided under precisely the statute involved in *Cox* but before our decision in that case was announced, it might well be supposed that, without further ado, we would vacate and remand in light of *Cox*. But because the incident leading to the present convictions occurred in a public library and might be thought to raise materially different questions, we have heard argument and have considered the case *in extenso*.

The locus of the events was the Audubon Regional Library in the town of Clinton, Louisiana, Parish of East Feliciana. The front room of the building was used as a public library facility where patrons might obtain library services. It was a small room, containing two tables and one chair (apart from the branch assistant's desk and chairs), a stove, a card catalogue, and open book shelves. The room was referred to by the regional librarian, Mrs. Perkins, as "the adult reading-room, the adult service-room." The library permitted "registered borrowers" to "browse" among the books in the room or to borrow books. A "registered borrower" was one who could produce an identification card showing that he was registered by the Audubon Regional Library. Other space in the building included the headquarters of the regional library.

The Audubon Regional Library is operated jointly by the Parishes of East Feliciana, West Feliciana, and St. Helena. It has three branches and two bookmobiles.

The bookmobiles served 33 schools, both white and Negro, as well as "individuals." One of the bookmobiles was red, the other blue. The red bookmobile served only white persons. The blue bookmobile served only Negroes. It is a permissible inference that no Negroes used the branch libraries.[4]

The registration cards issued to Negroes were stamped with the word "Negro." A Negro in possession of such a card was entitled to borrow books, but only from the blue bookmobile. A white person could not receive service from the blue bookmobile. He would have to wait until the red bookmobile came around, or would have to go to a branch library.

This tidy plan was challenged on Saturday, March 7, 1964, at about 11:30 a. m. Five young Negro males, all residents of East or West Feliciana Parishes, went into the adult reading or service room of the Audubon Regional Library at Clinton. The branch assistant, Mrs. Katie Reeves, was alone in the room. She met the men "between the tables" and asked if she "could help." Petitioner Brown requested a book, "The Story of the Negro" by Arna Bontemps. Mrs. Reeves checked the card catalogue, ascertained that the Branch did not have the book, so advised Mr. Brown, and told him that she would request the book from the State Library, that he would be notified upon its receipt and that "he could either pick it up or it would be mailed to him." She told him that "his point of service was a bookmobile or it could be mailed to him." Mrs. Reeves testified that she expected that the men would then leave; they did not, and she asked them to leave. They did not. Petitioner Brown sat down and the others stood near him. They said nothing; there was no noise or boisterous talking.

---

[4] The inference finds support in testimony both of the sheriff and of Mrs. Laura Spears, a witness for the defense who was employed as the assistant in charge of the blue bookmobile.

Mrs. Reeves called Mrs. Perkins, the regional librarian, who was in another room. Mrs. Perkins asked the men to leave. They remained.

Neither Mrs. Reeves nor Mrs. Perkins had called the sheriff, but in "10 to 15 minutes" from the time of the arrival of the men at the library, the sheriff and deputies arrived. The sheriff asked the Negroes to leave. They said they would not. The sheriff then arrested them. The sheriff had been notified that morning that members of the Congress of Racial Equality "were going to sit-in" at the library. Ordinarily, the sheriff testified, CORE tells him when they are going to demonstrate or picket. The sheriff was standing at his "place of business" when he saw "these 5 colored males coming down the street." He saw them enter the library. He called the jail to notify his deputies, and he reached the library immediately after the deputies got there. When the sheriff arrived, there was no noise, no disturbance. He testified that he arrested them "for not leaving a public building when asked to do so by an officer."

The library obtained the requested book and mailed it to Mr. Brown on March 28, 1964. An accompanying card said, "You may return the book either by mail or to the Blue Bookmobile." The reference to the color of the vehicle was obviously not designed to facilitate identification of the library vehicle. The blue bookmobile is for Negroes and for Negroes only.

In the course of argument before this Court, counsel for both the State and petitioners stated that the Clinton Branch was closed after the incident of March 7. Counsel for the State also advised the court that the use of cards stamped "Negro" continues to be the practice of the regional library.

On March 25, 1964, Mr. Brown and his four companions were tried and found guilty. Brown was sentenced to pay $150 and costs, and in default thereof to spend

90 days in the parish jail. His companions were sentenced to $35 and costs, or 15 days in jail. The charge was that they had congregated together in the public library of Clinton, Louisiana, "with the intent to provoke a breach of the peace and under circumstances such that a breach of the peace might be occasioned thereby" and had failed and refused "to leave said premises when ordered to do so" by the librarian and by the sheriff.

The Louisiana breach of peace statute under which they were accused reads as follows: "Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby: (1) crowds or congregates with others . . . in . . . a . . . public place or building . . . and who fails or refuses to disperse and move on, or disperse or move on, when ordered so to do by any law enforcement officer . . . or any other authorized person . . . shall be guilty of disturbing the peace." [5]

Under Louisiana law, these convictions were not appealable. See *Garner* v. *Louisiana, supra,* at 161–162. Petitioners sought discretionary review by the Louisiana Supreme Court, which denied their application, finding no error. This Court granted certiorari, 381 U. S. 901, and we reverse.

We may briefly dispose of certain threshold problems. Petitioners cannot constitutionally be convicted merely because they did not comply with an order to leave the library. See *Shuttlesworth* v. *City of Birmingham,* 382 U. S. 87, 90–91; *Wright* v. *Georgia,* 373 U. S. 284, 291–293; *Johnson* v. *Virginia,* 373 U. S. 61; cf. *Cox* v. *Louisiana, supra,* at 579 (separate opinion of MR. JUSTICE BLACK). The statute itself reads in the conjunctive; it requires both the defined breach of peace *and* an order to move on. Without reference to the statute, it

---

[5] La. Rev. Stat. § 14:103.1 (Cum. Supp. 1962).

must be noted that petitioners' presence in the library was unquestionably lawful. It was a public facility, open to the public. Negroes could not be denied access since white persons were welcome. *Wright* v. *Georgia, supra,* at 292; *Watson* v. *City of Memphis,* 373 U. S. 526; *Johnson* v. *Virginia, supra.* Petitioners' deportment while in the library was unexceptionable. They were neither loud, boisterous, obstreperous, indecorous nor impolite. There is no claim that, apart from the continuation—for ten or fifteen minutes—of their presence itself, their conduct provided a basis for the order to leave, or for a charge of breach of the peace.

We come, then, to the barebones of the problem. Petitioners, five adult Negro men, remained in the library room for a total of ten or fifteen minutes. The first few moments were occupied by a ritualistic request for service and a response. We may assume that the response constituted service, and we need not consider whether it was merely a gambit in the ritual. This ceremony being out of the way, the Negroes proceeded to the business in hand. They sat and stood in the room, quietly, as monuments of protest against the segregation of the library. They were arrested and charged and convicted of breach of the peace under a specific statute.

If we compare this situation with that in *Garner,* we must inevitably conclude that here, too, there is not the slightest evidence which would or could sustain the application of the statute to petitioners. The statute requires a showing either of "intent to provoke a breach of the peace," or of "circumstances such that a breach of the peace may be occasioned" by the acts in question. There is not in this case the slightest hint of either. We need not be beguiled by the ritual of the request for a copy of "The Story of the Negro." We need not assume that petitioner Brown and his friends were in search of a book for night reading. We instead rest upon the

manifest fact that they intended to and did stage a peaceful and orderly protest demonstration, with no "intent to provoke a breach of the peace." See *Garner* v. *Louisiana, supra,* at 174.

Nor were the circumstances such that a breach of the peace might be "occasioned" by their actions, as the statute alternatively provides. The library room was empty, except for the librarians. There were no other patrons. There were no onlookers except for the vigilant and forewarned sheriff and his deputies. Petitioners did nothing and said nothing even remotely provocative. The danger, if any existed, was surely less than in the course of the sit-in at the "white" lunch counters in *Garner.* And surely there was less danger that a breach of the peace might occur from Mrs. Katie Reeves and Mrs. Perkins in the adult reading room of the Clinton Branch Library than that disorder might result from the "restless" white people in the bus depot waiting room in *Taylor,* or from the 100 to 300 "grumbling" white onlookers in *Cox.* But in each of these cases, this Court refused to countenance convictions under Louisiana's breach of the peace statute.

The argument of the State of Louisiana, however, is that the issue presented by this case is much simpler than our statement would indicate. The issue, asserts the State, is simply that petitioners were using the library room "as a place in which to loaf or make a nuisance of themselves." The State argues that the "test"—the permissible civil rights demonstration—was concluded when petitioners entered the library, asked for service and were served. Having satisfied themselves, the argument runs, that they could get service, they should have departed. Instead, they simply sat there, "staring vacantly," and this was "enough to unnerve a woman in the situation Mrs. Reeves was in."

This is a piquant version of the affair, but the matter is hardly to be decided on points. It was not a game. It could not be won so handily by the gesture of service to this particular request. There is no dispute that the library system was segregated, and no possible doubt that these petitioners were there to protest this fact. But even if we were to agree with the State's ingenuous characterization of the events, we would have to reverse. There was no violation of the statute which petitioners are accused of breaching; no disorder, no intent to provoke a breach of the peace and no circumstances indicating that a breach might be occasioned by petitioners' actions. The sole statutory provision invoked by the State contains not a word about occupying the reading room of a public library for more than 15 minutes, any more than it purports to punish the bare refusal to obey an unexplained command to withdraw from a public street, see *Garner, supra,* or public building. We can find nothing in the language of the statute, in fact, which would elevate the giving of cause for Mrs. Reeves' discomfort, however we may sympathize with her, to a crime against the State of Louisiana. Cf. *Shuttlesworth* v. *City of Birmingham,* 382 U. S. 87, 101 (concurring opinion).

But there is another and sharper answer which is called for. We are here dealing with an aspect of a basic constitutional right—the right under the First and Fourteenth Amendments guaranteeing freedom of speech and of assembly, and freedom to petition the Government for a redress of grievances. The Constitution of the State of Louisiana reiterates these guaranties. See Art. I, §§ 3, 5. As this Court has repeatedly stated,[6] these

---

[6] See, *e. g., N. A. A. C. P.* v. *Button,* 371 U. S. 415, 428–431; *Garner* v. *Louisiana, supra,* at 201 (separate opinion of Mr. Justice Harlan); *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, 460–463; *Stromberg* v. *California,* 283 U. S. 359, 369. See Kalven, *op. cit. supra,* n. 1, at 129–138.

rights are not confined to verbal expression. They embrace appropriate types of action which certainly include the right in a peaceable and orderly manner to protest by silent and reproachful presence, in a place where the protestant has every right to be, the unconstitutional segregation of public facilities.[7]  Accordingly, even if the accused action were within the scope of the statutory instrument, we would be required to assess the constitutional impact of its application, and we would have to hold that the statute cannot constitutionally be applied to punish petitioners' actions in the circumstances of this case.  See *Edwards* v. *South Carolina, supra,* at 235. The statute was deliberately and purposefully applied solely to terminate the reasonable, orderly, and limited exercise of the right to protest the unconstitutional segregation of a public facility.  Interference with this right, so exercised, by state action is intolerable under our Constitution.  *Wright* v. *Georgia, supra,* at 292.

It is an unhappy circumstance that the locus of these events was a public library—a place dedicated to quiet, to knowledge, and to beauty.  It is a sad commentary that this hallowed place in the Parish of East Feliciana bore the ugly stamp of racism.  It is sad, too, that it was a public library which, reasonably enough in the circumstances, was the stage for a confrontation between those discriminated against and the representatives of the offending parishes.  Fortunately, the circumstances here were such that no claim can be made that use of the library by others was disturbed by the demonstration.  Perhaps the time and method were carefully chosen with this in mind.  Were it otherwise, a factor not present in this case would have to be considered.  Here, there was no disturbance of others, no disruption of library activities, and no violation of any library regulations.

---

[7] Cf. *Wright* v. *Georgia, supra.*

A State or its instrumentality may, of course, regulate the use of its libraries or other public facilities. But it must do so in a reasonable and nondiscriminatory manner, equally applicable to all and administered with equality to all. It may not do so as to some and not as to all. It may not provide certain facilities for whites and others for Negroes. And it may not invoke regulations as to use—whether they are *ad hoc* or general—as a pretext for pursuing those engaged in lawful, constitutionally protected exercise of their fundamental rights. Cf. *Wright* v. *Georgia, supra,* at 293.

The decision below is

*Reversed.*

MR. JUSTICE BRENNAN, concurring in the judgment.

Petitioners were charged with and convicted of violating the Louisiana statute, § 14:103.1, which provides:

> "Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby . . . crowds or congregates with others . . . in or upon . . . a public street or public highway, or upon a public sidewalk, or any other public place or building . . . and who fails or refuses to disperse and move on . . . when ordered so to do by any law enforcement officer of any municipality, or parish, in which such act or acts are committed, or by any law enforcement officer of the state of Louisiana, or any other authorized person . . . shall be guilty of disturbing the peace." La. Rev. Stat. § 14:103.1 (Cum. Supp. 1962).

In *Cox* v. *Louisiana,* 379 U. S. 536, 551–552, the Court declared this statute as construed unconstitutional for overbreadth: it "is unconstitutional in that it sweeps within its broad scope activities that are constitutionally protected free speech and assembly." This holding was

concurred in by my Brothers BLACK, 379 U. S. 559, 576–580, HARLAN, and WHITE, *id.*, at 591. No limiting construction [1] or legislative revision [2] has intervened, and no circumstance of this case makes that declaration of invalidity less controlling here. The overbreadth of the statute recognized in *Cox* therefore requires the reversal of these convictions.

The appellants in *Cox* were convicted for their conduct on public streets and sidewalks, while petitioners here were convicted for their conduct in a public library. Because of this it is contended in dissent, *post*, p. 157, that *Cox* and this case involve different "phases" of § 14:103.1—a "public street and sidewalk phase" in contrast to a "public building phase." Insofar as this dissection of the statute is meaningful, it does not make the holding of *Cox* inapplicable; [3] both phases are overbroad and the overbreadth of each poses a serious threat to the exercise of constitutional rights.

*First.* The overbreadth of § 14:103.1 discerned in *Cox* did not inhere in the terms "public street" or "public sidewalk"; it inhered in the phrase "breach of the peace" as interpreted by the Supreme Court of Louisiana to mean "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet." 379 U. S., at 551. Nothing in the Louisiana courts' decisions in this case rejects this interpretation of the phrase "breach of the peace" for the public building phase of

---

[1] See *Shuttlesworth* v. *City of Birmingham*, 382 U. S. 87, 99 (concurring opinion); *Dombrowski* v. *Pfister*, 380 U. S. 479, 491, n. 7.

[2] Compare *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, and *Commercial Pictures Corp.* v. *Regents*, 346 U. S. 587, with *Kingsley Int'l Pictures Corp.* v. *Regents*, 360 U. S. 684.

[3] In declaring the statute unconstitutional for overbreadth the Court in *Cox* relied heavily on *Terminiello* v. *Chicago*, 337 U. S. 1, a case involving the application of a breach of the peace ordinance to an individual purporting to exercise First Amendment rights in an auditorium, not on the streets or sidewalks.

§ 14:103.1; nor is there anything about a public building that would make this definition of the proscribed conduct inapplicable.

The public building phase of § 14:103.1, especially when read in context of the other phases, is not, contrary to the dissent's suggestion, *post,* p. 162, restricted to, nor even aimed at, "trespassers on government property"; Louisiana has a separate criminal statute, not at all involved in this prosecution, which explicitly deals with trespassing in public buildings.[4] Moreover, I reject the suggestion that this breach of the peace statute, making refusal to obey an order "to disperse and move on" an element of the crime, is as narrow as a sufficiently specific trespass statute explicitly concerned with trespassing on government property that also makes refusal to obey an order to keep off or leave the property an element of the crime. Because this statute seeks to curb breaches of the peace and risks of such breaches occurring through crowding, it apparently permits a wide range of persons to issue the requisite order, no formal or customary procedures need be followed in issuing the order, and instantaneous and unquestioning compliance with the order is required. For example, the trial court below, in applying § 14:103.1, assumed that as a matter of state law any employee of the library would have the authority to issue the order "to disperse and move on"

---

[4] La. Acts 1963, No. 91, amending and re-enacting La. Rev. Stat. § 14:63.3 (Cum. Supp. 1962). The dissent refers to subdivision (4) of § 14:103.1 to support its view that subdivision (1), the basis for the charges and the convictions, "is to all intents and purposes aimed at trespassers on government property." *Post,* p. 162. However, subdivision (4) is also modified by the introductory clause "Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby"; and thus to establish a violation of that subdivision more than the refusal to leave the "premises of another" after an order to do so would have to be proved.

simply as the occasion arose and that petitioners were expected to immediately comply with the order even though they might have reasonably thought they were being ejected simply to preserve the segregated character of the library. Cf. *Wright* v. *Georgia,* 373 U. S. 284, 291–292.

*Second.* The danger posed by the Louisiana courts' definition of "breach of the peace"—that it might sweep within its broad scope activities that are constitutionally protected—is no less present when read in conjunction with "public building" than when read with "public street" and "public sidewalk." The constitutional protection for conduct in a public building undertaken to desegregate governmental services provided therein derives from both the First Amendment guarantees of freedom of speech, petition and assembly,[5] and

---

[5] Cf. *N. A. A. C. P.* v. *Button,* 371 U. S. 415, 428–431; *Garner* v. *Louisiana,* 368 U. S. 157, 201–202 (opinion of MR. JUSTICE HARLAN): "There was more to the conduct of those petitioners than a bare desire to remain at the 'white' lunch counter and their refusal of a police request to move from the counter. We would surely have to be blind not to recognize that petitioners were sitting at these counters, where they knew they would not be served, in order to demonstrate that their race was being segregated in dining facilities in this part of the country.

"Such a demonstration, in the circumstances of these two cases, is as much a part of the 'free trade in ideas,' *Abrams* v. *United States,* 250 U. S. 616, 630 (Holmes, J., dissenting), as is verbal expression, more commonly thought of as 'speech.' It, like speech, appeals to good sense and to 'the power of reason as applied through public discussion,' *Whitney* v. *California,* 274 U. S. 357, 375 (Brandeis, J., concurring), just as much as, if not more than, a public oration delivered from a soapbox at a street corner. This Court has never limited the right to speak, a protected 'liberty' under the Fourteenth Amendment, *Gitlow* v. *New York,* 268 U. S. 652, 666, to mere verbal expression. *Stromberg* v. *California,* 283 U. S. 359; *Thornhill* v. *Alabama,* 310 U. S. 88; *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624, 633–634. See also *N. A. A. C. P.* v. *Ala-*

the Equal Protection Clause's prohibition against racial segregation of governmental services and facilities. Overbreadth in the public building phase might inhibit the exercise of these constitutional rights by threatening punishment of the initial efforts to secure such desegregation. For example, the public building phase of § 14:103.1 might be read as reaching the conduct of two Negroes who did nothing more than enter a library restricted to whites, request a book and refuse to leave when ordered to do so before service was rendered. The conduct of the two Negroes would be as constitutionally protected as the conduct of the Negro who refused to leave the white section of a segregated courtroom, *Johnson* v. *Virginia,* 373 U. S. 61, and yet their conduct would be punishable under § 14:103.1 because their purpose could be deemed "to agitate, to arouse from a state of repose, to molest, to interrupt, to hinder, to disquiet."

In light of these possible clearly unconstitutional applications of the statute, we need not decide whether petitioners' actual conduct is constitutionally protected; for "in appraising a statute's inhibitory effect upon such rights, this Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar." *N. A. A. C. P.* v. *Button,* 371 U. S. 415, 432. It suffices that petitioners' conduct was arguably constitutionally protected and was "not the sort

---

*bama,* 357 U. S. 449, 460. If the act of displaying a red flag as a symbol of opposition to organized government is a liberty encompassed within free speech as protected by the Fourteenth Amendment, *Stromberg* v. *California, supra,* the act of sitting at a privately owned lunch counter with the consent of the owner, as a demonstration of opposition to enforced segregation, is surely within the same range of protections."

Public buildings often provide a forum for more traditional forms of First Amendment activity, such as verbal expression. See, *e. g., Thomas* v. *Collins,* 323 U. S. 516 (city hall); *Terminiello* v. *Chicago,* 337 U. S. 1 (auditorium open to public in privately owned building).

of 'hard-core' conduct that would obviously be prohibited under any construction" [6] of § 14:103.1. It was engaged in to achieve desegregation of the library through a request for service and a protest, expressed by petitioners' continued presence. Petitioners were orderly and quiet. Their continued presence, for a relatively short period of time, did not interfere with the functioning of the library. Their presence might have embarrassed and unnerved the librarians, who had in the past faithfully observed the policy of segregation; but such "vague disquietudes" [7] do not take petitioners' conduct outside the appropriate limits. The sheriff gave petitioners no reason for the order to leave,[8] and thus petitioners might

---

[6] *Dombrowski* v. *Pfister,* 380 U. S., at 491–492.

[7] *Watson* v. *City of Memphis,* 373 U. S. 526, 535–536. See generally *Buchanan* v. *Warley,* 245 U. S. 60, 81; *Cooper* v. *Aaron,* 358 U. S. 1, 16; *Taylor* v. *Louisiana,* 370 U. S. 154, 156; *Wright* v. *Georgia,* 373 U. S., at 293; *Cox* v. *Louisiana,* 379 U. S., at 551.

[8] On cross-examination the sheriff testified as follows:

"Q. Sheriff, did you arrest these people, these defendants, because you considered their action going into the Library as a demonstration?

"A. I arrested them because the occupants of the building had asked them to leave, and so had I; it was a public building and they refused to leave.

. . . . .

"Q. What did you tell them when you went in, Sheriff, did you have any conversations with these people?

"A. Not with them, I talked to Mrs. Perkins, and she told me that she had taken their application and had asked them to leave, and they wouldn't, and I asked them to leave. Henry Brown told me it was a public library, the rest of them didn't say anything.

"Q. Did Brown mention anything to you about wanting a book on the Constitution of the United States?

"A. He did not.

"Q. After Brown told you that it was a public library, what did you say then?

"A. I don't know of anything that I said. I was assured that Mrs.

have reasonably believed that they were being ejected only because they were Negroes seeking to exercise their constitutional rights;[9] as my Brother BLACK observed in *Feiner* v. *New York*, 340 U. S. 315, 327, "at least where time allows, courtesy and explanation of commands are basic elements of good official conduct in a democratic society."

Since the overbreadth of § 14:103.1 as construed clearly requires the reversal of these convictions,[10] it is wholly unnecessary to reach, let alone rest reversal, as

---

Perkins had asked them to leave since they didn't have the book they wanted.

"Q. Did you, at that point, ask them to leave?

"A. I did.

"Q. When you——

"A.—And I also told them that they had the choice of leaving, or be arrested for not leaving a public building when asked to do so by an officer.

"Q. When you got there, Sheriff, was anybody making any noise?

"A. No noise.

.         .         .         .         .

"Q. Prior to your asking these defendants to leave, did you ask each of them, all of them, whether or not they intended to use the reference-books at the Library?

"A. I didn't ask them what they intended to do, and they didn't state at that time what they were doing there."

[9] See *Wright* v. *Georgia*, 373 U. S., at 291–292: "Obviously . . . one cannot be punished for failing to obey the command of an officer if that command is itself violative of the Constitution."

[10] This ground of reversal makes it unnecessary to decide whether subdivision (1) of § 14:103.1 embodies an invidious discrimination because it contains the following exemption: "[N]othing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions . . . ." My Brother BLACK in his opinion in *Cox* v. *Louisiana*, 379 U. S., at 581, found the obstructing public passages statute (La. Rev. Stat. § 14:100.1 (Cum. Supp. 1962)) to embody "an invidious discrimination forbidden by

the prevailing opinion seems to do, on the proposition that even a narrowly drawn "statute cannot constitutionally be applied to punish petitioners' actions in the circumstances of this case."

MR. JUSTICE WHITE, concurring in the result.

Were it clear from this record that lingering in a public library for 10 minutes after ordering a wanted book contravened some explicit statute, ordinance, or library regulation of general application, or even if it were reasonably clear that a 10-minute interlude between receiving service and departure exceeded what is generally contemplated as a normal use of a public library, I would have difficulty joining in a reversal of this case, for in either of these events, I would consider a refusal to leave the library and an insistence upon violating a generally applicable condition concerning the use of the library evidence of an intent to breach the peace constitutionally sufficient to sustain a conviction. Nor would I deem the First Amendment to forbid a municipal regulation limiting loafing in library reading rooms.

But nothing of the kind comes through to me in this record. There is no such ordinance or regulation and it can hardly be said that the brief sojourn in this parish library departed so far from the common practice of library users. The petitioners were there but a very brief period before being asked to leave, they were quiet and orderly, they interfered with no other library users and for all this record reveals they might have been considering among themselves what to do with the rest of their day. I think that the petitioners were entitled to be where they were for the time that they remained, and it is difficult to believe that if this group had been white its members would have been asked to leave on such

---

the Equal Protection Clause of the Fourteenth Amendment" because it contained the same exemption from its coverage for labor union activities.

short notice, much less asked to leave by the sheriff and arrested, rather than merely escorted from the building, when reluctance to leave was demonstrated. That the library was a segregated institution and was not in the habit of allowing Negroes in the building only underlines this situation. In my view, the behavior of these petitioners and their use of the library building, even though it was for the purposes of a demonstration, did not depart significantly from what normal library use would contemplate.

The conclusion that petitioners were making only a normal and authorized use of this public library requires the reversal of their convictions. Petitioners' entering the library and refusing to forgo a use of the library normally permitted members of the public is no evidence, in the circumstances of this case, of any intent to breach the peace. Moreover, if the petitioners were making a use of the library normally permitted whites, why were they asked to leave the library? They were quiet, orderly, and exhibited no threatening or provocative behavior. The library had been a segregated institution, has been closed since the incident involved in this case, and the petitioners were advised they could pick up the desired book at the blue bookmobile. The State arrested petitioners because they refused to leave the library but offers no convincing explanation for why they were asked to leave. On this record, it is difficult to avoid the conclusion that petitioners were asked to leave the library because they were Negroes. If they were, their convictions deny them equal protection of the laws.

MR. JUSTICE BLACK, with whom MR. JUSTICE CLARK, MR. JUSTICE HARLAN, and MR. JUSTICE STEWART join, dissenting.

I do not believe that any provision of the United States Constitution forbids any one of the 50 States of the

Union, including Louisiana, to make it unlawful to stage "sit-ins" or "stand-ups" in their public libraries for the purpose of advertising objections to the State's public policies. That, however, is precisely what the Court or at least a majority of the Court majority [1] here holds that all the States are forbidden to do by our Constitution. I dissent. The three opinions written for the majority of five who reverse these convictions make it necessary for me to state the relevant facts, circumstances, and issues in this case as I view them.

Representatives of the Congress of Racial Equality (CORE) claimed that Negroes had been "locked out" of libraries operated jointly by three Louisiana parishes. A "demonstration was planned" by the organization "to integrate the Library," and accordingly these five petitioners, all Negroes, went to the Audubon Regional Library located at Clinton, Louisiana, on a Saturday morning about 11:30 "to sit-in at the Library." The county sheriff, whose office was in the courthouse within sight of the library building, had received information that "they [referring to CORE] were going to sit-in, or that something was going to take place at the Library that morning," and noticed the petitioners when they went by his office on their way to the library. Upon arrival at the library petitioners were met inside the building by Mrs. Reeves, who was the assistant librarian. She courteously asked them if she could help them in any way. One of the group, petitioner Brown, handed her a slip of paper on which was written the title of a book which he said he wanted. Mrs. Reeves went to her

---

[1] There are three separate opinions which support reversal of the decision below. The opinion of my Brother Fortas, which for convenience I will call the majority's "prevailing" opinion, is joined by The Chief Justice and my Brother Douglas. My Brothers Brennan and White each concur in the result of the prevailing opinion, but reach that result on different grounds.

shelves and her catalogues, and after making a search, came back and told Mr. Brown that the library did not have the book, but that she could request it from the state library and probably get it for him. She told him she would do this. Mr. Brown then sat down in the only chair in the library room other than the chair at Mrs. Reeves' desk, and the other four petitioners stood around him. When petitioners did not leave, Mrs. Reeves told the group again that she would send for the book, and when Mr. Brown continued to sit and the others continued to stand, she asked them to leave. They did not leave, so Mrs. Reeves then called Mrs. Perkins, the regional librarian, and told Mrs. Perkins about the situation. Mrs. Perkins went to Mr. Brown and told him she did not know whether he understood that a request for the book he had asked for would be sent to the state library. Along about that time Mr. Brown said to Mrs. Perkins, "what about the Constitution?" but did not request that any copy of the Constitution be given to him. Mrs. Perkins then repeated the request of Mrs. Reeves that petitioners leave the library telling them "that the one who seemed to want something had been served." About 10 or 15 minutes after the petitioners came to the library, when according to Mrs. Perkins' testimony she was just about to call the sheriff over the phone, the sheriff came into the library. Mrs. Perkins explained to him that Mrs. Reeves had taken petitioners' application for the book they wanted, that the book was not available, that she and Mrs. Reeves had both requested the petitioners to leave, and that they would not do so. After learning these facts, the sheriff also asked petitioners to leave the library building and stated that he would have to arrest them if they did not. The petitioners refused to leave, and speaking for the group petitioner Brown told the sheriff

"that he was not going to leave the Library." Thereupon the sheriff immediately arrested all of them. Petitioners, while in the library, never talked in unusually loud voices and used no bad language. Beyond Mr. Brown's request for the book which the library did not have, none of the petitioners at any time prior to his arrest requested any further service of either of the librarians, nor did any petitioner in any other way seek to read in the library or otherwise use any of the library's facilities except for sitting and standing purposes.

The Clinton branch of the Audubon Regional Library is not a large one. It appears to be used almost entirely as a circulating and not a reading library. The duty of Mrs. Reeves, assistant librarian, according to her testimony which was not disputed, was "To assist people who come into the Library to select their books; check out the books to them; to keep the shelves in order, and to keep a record of the circulation of the day." In the library's "lobby," where the events of this case took place, there were book shelves and one table on each side; also in the room were a desk and chair for the librarian, and one other chair. The two tables were used mainly for book display and magazines. It was not against the policy of the library to allow citizens with library registration cards to read if they cared to. But according to Mrs. Reeves' testimony at trial, "very few people read; if a book is there and they want it, they take it and go." Mrs. Perkins testified that "We do not maintain a reading-room, as such, we do not have the space for it." Mrs. Perkins later referred to the "lobby" as the "adult reading-room, the adult service-room."

The particular part of the Louisiana statute,[2] under which petitioners were convicted, contrary to implica-

---

[2] La. Rev. Stat. § 14:103.1 (Cum. Supp. 1962).

tions in the other opinions, has never been before this Court previous to this time. It provides as follows:

> "Whoever with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby . . . congregates with others . . . in any . . . public . . . building . . . , and who fails or refuses to . . . move on, when ordered so to do by any law enforcement officer of any municipality . . . or any other authorized person . . . shall be guilty of disturbing the peace."

The information against these petitioners charged, substantially in the language of the statute, that petitioners failed and refused to leave the library when ordered to do so by Mrs. Perkins who was in lawful charge of the library and also failed to leave the premises when ordered to do so by the sheriff.

Because I think that the crucial issues to be decided here are much narrower and far less complicated than the prevailing opinion implies, I find it necessary first to point out that several matters discussed in that opinion are, in my judgment, either irrelevant, or do not justify the inferences drawn from them.

## I.

In concluding to reverse these convictions the prevailing opinion relies almost entirely on three prior breach of the peace cases which have come to this Court from the State of Louisiana, and *Edwards* v. *South Carolina*, 372 U. S. 229. I think that none of these four cases has any appreciable bearing on what the Court should hold in this case.

(a) The first of these cases is *Garner* v. *Louisiana*, 368 U. S. 157, decided in December 1961. That case, in-

volving "sit-in" demonstrations at several lunch counters, was decided under an old Louisiana breach of the peace statute. The section involved here was added to the old law after the events described in that case took place, but before the Court's opinion. The old law considered in *Garner* did not contain any phrase similar to the one under consideration here which makes it an offense to disturb the peace by congregating in a public building over the protest of a person rightfully in charge of the building. Moreover, the majority of the Court in *Garner,* in construing the old law, noted the presence of the new section, and expressly contrasted its reach with that of the older statute. 368 U. S., at 168–169. There are other significant differences between *Garner* and this case, but the fact that *Garner* involved an almost entirely different statute, which was expressly distinguished from the present one by the Court's opinion, makes it hard for me to see how the Court's *Garner* holding can provide any meaningful support for the reversal of these convictions.

(b) The second Louisiana breach of the peace case upon which the prevailing opinion relies for reversal is *Taylor* v. *Louisiana,* 370 U. S. 154. That case as described today in the prevailing opinion "concerned a sit-in by Negroes in a waiting room at a bus depot, reserved 'for whites only.' " In *Taylor,* the Court in a short *per curiam* opinion held merely that the breach of the peace convictions could not be supported where "the only evidence to support the charge was that petitioners were violating a custom that segregated people in waiting rooms according to their race" contrary to federal law. 370 U. S., at 156. There was no indication in that case that persons, having no business whatever in a bus depot except to stage a public protest against some state policy, have a constitutional

right to occupy the depot's space after having been requested by competent authorities to leave.

(c) The case relied on most heavily by the prevailing opinion and my Brother BRENNAN is *Cox* v. *Louisiana,* 379 U. S. 536. That case, unlike this one, involved picketing and patrolling in the streets, and correspondingly that part of the Louisiana breach of the peace statute which prohibited certain kinds of street activity. The language of the phase of the statute under consideration here, relating to congregating in public buildings and refusing to move on when ordered to do so by an authorized person, was in no way involved or discussed in *Cox.* The problems of state regulation of the streets on the one hand, and public buildings on the other, are quite obviously separate and distinct. Public buildings such as libraries, schoolhouses, fire departments, courthouses, and executive mansions are maintained to perform certain specific and vital functions. Order and tranquillity of a sort entirely unknown to the public streets are essential to their normal operation. Contrary to the implications in the prevailing opinion it is incomprehensible to me that a State must measure disturbances in its libraries and on the streets with identical standards. Furthermore, the vice of discriminatory enforcement, which contaminates the "public street" phase of this statute,[3] does not beset the statute's application to activity in public buildings. In the public building, unlike the street, peace and quiet is a fast and necessary rule, and as a result there is much less room for peace officers to abuse their authority in enforcing the "public building" part of the statute.

In my Brother BRENNAN's separate concurring opinion the contention seems to be made that in *Cox* this

---

[3] See my concurring opinion in *Cox* v. *Louisiana,* 379 U. S. 559, 578–580.

Court declared as unconstitutionally vague not only the part of the Louisiana statute under which Cox was convicted relating to picketing in the streets, but also the part creating the offense under which petitioners here were convicted. If this is true it means that in *Cox* the Court declared unconstitutional both the parts of the statute creating the offenses involved in the *Cox* case and this one, and also all of the some 30-odd separate and diverse offenses enumerated in the statute ranging from the making of obscene remarks and gestures, to causing a disturbance on a public bus, to refusing to leave the private premises of another when asked to do so by the owner. If the Court's holding was that broad it has placed in great jeopardy every breach of the peace statute in this country. I do not think the Court intended to do any such thing. I can see nothing in the Court's opinion in *Cox* or in any of the concurring opinions, one of which I wrote, which indicates an intention to make such a sweeping condemnation of breach of the peace statutes. In *Cox* this Court held unconstitutional the part of the statute under which Cox was convicted because as construed by the Louisiana Supreme Court it authorized "persons to be punished merely for peacefully expressing unpopular views." 379 U. S., at 551. The part of the statute involved here which makes it an offense to congregate in a public building and refuse to leave it when asked to do so by an authorized person, does not affect or threaten in any way an exercise of the rights of free speech, and the Louisiana courts did not so construe this phase of the statute as they had construed the part under which Cox was convicted. The phase of the statute under scrutiny in this case clearly and precisely regulates certain particular conduct in language which taken as a whole has no ambiguity whatever. Persons of ordinary intelligence would have no difficulty whatever in knowing that this part of the statute requires them to

move on from a public building when an authorized person asks them to do so. See *United States* v. *Petrillo,* 332 U. S. 1, 5–8. The only conduct reached by this part of the statute is a refusal to move on when requested to do so by an authorized person and this conduct is described in words declared in *Cox* to be "narrow and specific." [4]  379 U. S., at 551. Since petitioners here had no library business whatever the Constitution of the United States does not require that they be permitted to remain in the library despite state law to the contrary.

(d) The fourth case which the prevailing opinion cites as indicating that the "public building" phase of the Louisiana statute is unconstitutional is *Edwards* v. *South Carolina,* 372 U. S. 229. This Court's holding in the *Edwards* case, however, was based on the fact that the statute construed there was not narrowly drawn to assure its nondiscriminatory application. Here the part of the Louisiana statute relating to public buildings, as construed and applied by the Louisiana courts, does clearly describe the offense. Nothing in *Edwards* as I read it, states any principle of constitutional law under which a State must permit its public libraries, dedicated to reading and learning and studying, to be used for the purpose of conducting protests against public or private policies. And that is the constitutional issue in the present case.

I find nothing in these four cases, nor in any other case decided by this Court that I can recall, which re-

---

[4] A condition under which this conduct is punishable is that it be entered into "with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby." In the context of the *Cox* case relating to activity on the public streets this Court held this language unconstitutionally vague. But as I have pointed out above, the Court could not have meant that every disturbing the peace statute which contains this language is unconstitutional.

160

stricts Louisiana's power to enforce that part of its stat-
ute on which these convictions rest in order to maintain
peace and order in its public libraries so as to further
the extremely necessary purposes underlying their
existence.

II.

The prevailing opinion and to some extent the two
separate concurring opinions treat this case as though
Louisiana was here attempting to enforce, a policy of
denying Louisiana citizens the right to use the State's
libraries on account of race. Whatever may have been
the policy of the State of Louisiana in the past or may
be the policy of that State at the present, at other places
or in other circumstances, there simply was no racial
discrimination practiced in this case. These petitioners
were treated with every courtesy and granted every con-
sideration to which they were entitled in the Audubon
Regional Library. They asked for a book, perhaps as the
prevailing opinion suggests more as a ritualistic ceremo-
nial than anything else. The lady in charge nevertheless
hunted for the book, found she did not have it, sent for it,
and later obtained it from the state library for petitioners'
use.[5] No petitioner asked for any other book, none indi-
cated that he wanted to read any other book, and none
attempted to read any other book or any other printed
matter. As a matter of fact the record shows, and the
prevailing opinion admits, that the five petitioners stayed
in the library not to use it for learning but as "monu-
ments of protest" to voice their disapproval of what they

---

[5] The note describing the book he wanted which petitioner Brown
gave Mrs. Reeves read, "Wendall Arna, the Story of the Negro:
Bontems." This information apparently described no printed book.
The book which was obtained from the state library for petitioners'
use was The Story of the Negro, by Arna Bontemps.

thought was a policy of the State. Although Mrs. Perkins, the branch's librarian, testified unambiguously that there was no racial discrimination practiced at her library, and although the record shows without the slightest dispute that there was no discrimination of any kind or character practiced against these petitioners, in at least the prevailing opinion and that of my Brother WHITE it is nevertheless implied at several places that the equal treatment given these petitioners was some kind of subterfuge or sham. These aspersions are I think wholly without justification. The prevailing opinion refers to the "tidy plan" of the State; with reference to the service given petitioners it says that "We may assume that the response constituted service, and we need not consider whether it was merely a gambit in the ritual"; it insinuates that Louisiana was playing a "game" with petitioners' rights, and the courteous treatment given petitioners by the librarian is degraded by calling it a "gesture of service"; it, moreover, refers to the State's argument in this case as giving a "piquant version of the affair." I see no basis or reason for these innuendos against the State's defense of its convictions in this case. The State's District Attorney, who argued the case before us, stated frankly and forthrightly that there would be no defense had Louisiana denied these petitioners equal service at its public libraries on account of their race. There was no such denial. We must now consider the Court's reversal on its merits.

### III.

As best I can tell, one ground upon which both the prevailing opinion and that of my Brother WHITE rely to reverse these convictions is that the State failed to prove its case. This conclusion appears to be based on the assumption that under the Louisiana statute properly

construed, there can be no conviction unless persons who do not want library service stay there an unusually long time after being ordered to leave, make a big noise, use some bad language, engage in fighting, try to provoke a fight, or in some other way become boisterous. The argument seems to be that without a blatant, loud manifestation of aggressive hostility or an exceedingly long "sit-in" or "sojourn" in a public library, there are no circumstances which could foreseeably occasion a breach of the peace. Louisiana has not so construed its statute nor should we. Doing so goes against common sense and common understanding. While soft words can undoubtedly turn away wrath, they may also provoke it. Disturbers of the peace do not always rattle swords or shout invectives. It is high time to challenge the assumption in which too many people have too long acquiesced, that groups that think they have been mistreated or that have actually been mistreated have a constitutional right to use the public's streets, buildings, and property to protest whatever, wherever, whenever they want, without regard to whom such conduct may disturb.

The phase of the Louisiana statute that we are considering here is to all intents and purposes aimed at trespassers on government property. In addition, subdivision (4) of the same Louisiana law makes it an offense for one to refuse to leave the premises of another when requested to do so by the owner. Both of these provisions of the state statute, however, provide that before an offense is committed, the conduct must be engaged in "with intent to provoke a breach of the peace, or under circumstances such that a breach of the peace may be occasioned thereby." There is a long history behind trespass laws in the United States. Invasion of another man's property over his protest is one of the surest ways any person can pick out to disturb the peace.

Louisiana, just like any other State in this Union, has a right to pass and use laws based on knowledge of this fact, a knowledge so widespread and prevalent that it would probably be difficult to find a hermit ignorant of its existence.

I think that the evidence in this case established every element in the offense charged against petitioners. No one disputes the fact that petitioners congregated in a public building and refused to move on when ordered to do so by authorized persons. The only factual question which can possibly arise regarding the application of the statute here is whether under Louisiana law petitioners either intended to breach the peace or created circumstances under which a breach might have been occasioned. The record shows that petitioners, as part of a plan, entered the library and once there stayed despite the librarians' protests until its normal activity was completely disrupted. To be sure, there were not "100 to 300 'grumbling' white onlookers" as there were in *Cox* v. *Louisiana, supra,* but surely, in the prevailing opinion's futile effort to rely on *Cox,* it is not meant that 300 or 100 grumbling onlookers must be crowded into a library before Louisiana can maintain an action under this statute. A tiny parish branch library, staffed by two women, is not a department store as in *Garner* v. *Louisiana, supra,* nor a bus terminal as in *Taylor* v. *Louisiana, supra,* nor a public thoroughfare as in *Edwards* v. *South Carolina, supra,* and *Cox.* Short of physical violence, petitioners could not have more completely upset the normal, quiet functioning of the Clinton branch of the Audubon Regional Library. The state courts below thought the disturbance created by petitioners constituted a violation of the statute. So far as the reversal here rests on a holding that the Louisiana statute was not violated, the Court simply substitutes its judgment

for that of the Louisiana courts as to what conduct satisfies the requirements of that state statute. We are a long way off from what happened there to substitute our judgment for theirs. To do so not only upsets settled doctrine concerning the interpretation of state statutes by federal courts, see, *e. g., Garner* v. *Louisiana, supra,* at 166; *Kingsley Pictures Corp.* v. *Regents,* 360 U. S. 684, 688, but also builds on shifting sands that ignore the realities of life in our country.

## IV.

Having already attempted to hold, wrongfully I think, that these convictions should be set aside as unconstitutional because of a complete lack of evidence to prove the charge, the prevailing opinion ventures out in an attempt to decide other constitutional questions. It says:

> "Accordingly, even if the accused action were within the scope of the statutory instrument, we would be required to assess the constitutional impact of its application, and we would have to hold that the statute cannot constitutionally be applied to punish petitioners' actions in the circumstances of this case."

I have sometimes thought that this Court has gone entirely too far in refusing to decide constitutional questions on the ground that they should be avoided where possible. The journey here, however, goes entirely too far in the opposite direction. Apparently unsatisfied with or unsure of the "no evidence" ground for reversing the convictions, the prevailing opinion goes on to state that the statute was used unconstitutionally in the circumstances of this case because it was "deliberately and purposefully applied solely to terminate the reasonable, orderly, and limited exercise of the right to protest the unconstitutional segregation of a public facility." First, I am

constrained to say that this statement is wholly unsupported by the record in this case. There is simply no evidence in the record at all that petitioners were arrested because they were exercising the "right to protest." It is nevertheless said that this was the *sole* reason for the arrests. Moreover, the conclusion that the statute was unconstitutionally applied because it interfered with the petitioners' so-called protest establishes a completely new constitutional doctrine. In this case this new constitutional principle means that even though these petitioners did not want to use the Louisiana public library for library purposes, they had a constitutional right nevertheless to stay there over the protest of the librarians who had lawful authority to keep the library orderly for the use of people who wanted to use its books, its magazines, and its papers. But the principle espoused also has a far broader meaning. It means that the Constitution (the First and the Fourteenth Amendments) requires the custodians and supervisors of the public libraries in this country to stand helplessly by while protesting groups advocating one cause or another, stage "sit-ins" or "stand-ups" to dramatize their particular views on particular issues. And it should be remembered that if one group can take over libraries for one cause, other groups will assert the right to do so for causes which, while wholly legal, may not be so appealing to this Court. The States are thus paralyzed with reference to control of their libraries for library purposes, and I suppose that inevitably the next step will be to paralyze the schools. Efforts to this effect have already been made all over the country. Furthermore, here it seems to have made no difference whatever that the Audubon Regional Library, at least in this instance, satisfied its constitutional duty by giving these petitioners its services in full measure without regard to their race.

The constitutional doctrine that actually prevails in this Court today for the first time in its history rests at least in great part on the Court's interpretation of the First Amendment as carried into the States by the Fourteenth.  This is the First Amendment which, as I have said in the past, is to me the very heart of our free government without which liberty and equality cannot exist.[6] But I have never thought and do not now think that the First Amendment can sustain the startling doctrine the prevailing opinion here creates.  The First Amendment, I think, protects speech, writings, and expression of views in any manner in which they can be legitimately and validly communicated.  But I have never believed that it gives any person or group of persons the constitutional right to go wherever they want, whenever they please, without regard to the rights of private or public property or to state law.  Indeed a majority of this Court said as much in *Cox* v. *Louisiana*, 379 U. S. 559, 574.  Though the First Amendment guarantees the right of assembly and the right of petition along with the rights of speech, press, and religion, it does not guarantee to any person the right to use someone else's property, even that owned by government and dedicated to other purposes, as a stage to express dissident ideas.  The novel constitutional doctrine of the prevailing opinion nevertheless exalts the power of private nongovernmental groups to determine what use shall be made of governmental property over the power of the elected governmental officials of the States and the Nation.

The prevailing opinion seems to find some comfort in its very questionable assumption that in this case "no claim can be made that use of the library by others was

---

[6] See my dissenting opinion in *Drivers Union* v. *Meadowmoor Co.* 312 U. S. 287, 301–302.

disturbed by the demonstration. Perhaps the time and method were carefully chosen with this in mind." . If this was the reason Saturday morning was selected, the only representative of CORE who testified was not aware of it.[7] No one of the petitioners has suggested such a thing. The lawyers for the petitioners have not. In fact at the trial responses of the sheriff to questions asked him by petitioners' lawyer indicate that there was another patron in the library at the time the petitioners "sat in" or "stood up" there. But even if there were no other patrons there in this instance, with this new constitutional doctrine rather shakily established, it is pretty clear that organized protesters will not overlook the chance to go into the libraries, and disturb those in there to learn, at a time when their "demonstration" activities will obtain the most publicity.

The prevailing opinion laments the fact that the place where these events took place was "a public library—a place dedicated to quiet, to knowledge, and to beauty." I too lament this fact, and for this reason I am deeply troubled with the fear that powerful private groups throughout the Nation will read the Court's action, as I do—that is, as granting them a license to invade the tranquillity and beauty of our libraries whenever they have quarrel with some state policy which may or may not exist. It is an unhappy circumstance in my judgment that the group, which more than any other has needed a government of equal laws and equal justice, is now encouraged to believe that the best way for it to

---

[7] Miss Feingold, task force worker for CORE and the State's first witness, testified on direct examination as follows:

"Q. Was there any particular reason for these defendants going to the Library on a Saturday morning?

"A. You mean on a Saturday as opposed to any other day?

"Q. Yes?

"A. No, I don't."

advance its cause, which is a worthy one, is by taking the law into its own hands from place to place and from time to time. Governments like ours were formed to substitute the rule of law for the rule of force. Illustrations may be given where crowds have gathered together peaceably by reason of extraordinarily good discipline reinforced by vigilant officers. "Demonstrations" have taken place without any manifestations of force at the time. But I say once more that the crowd moved by noble ideals today can become the mob ruled by hate and passion and greed and violence tomorrow. If we ever doubted that, we know it now. The peaceful songs of love can become as stirring and provocative as the Marseillaise did in the days when a noble revolution gave way to rule by successive mobs until chaos set in. The holding in this case today makes it more necessary than ever that we stop and look more closely at where we are going.

I would affirm.