578 F.2d 1122
 KNIGHTS OF the KU KLUX KLAN, REALM OF LOUISIANA, Plaintiff-Appellant,
v.
EAST BATON ROUGE PARISH SCHOOL BOARD et al., Defendants-Appellees.
 No. 76-2801.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 25, 1978.
 
 Lawrence R. Anderson, Jr., Baton Rouge, La., John Reed, Gen. Counsel, ACLU of La., New Orleans, La., for plaintiff-appellant.
 John F. Ward, Jr., Baton Rouge, La., for East Baton Rouge Parish school bd.
 Robert S. Leake, Asst. U. S. Atty., Baton Rouge, La., William H. Taft, IV, Gen. Counsel, George Lyon, Atty., Arline Mendelson, Dept. of H. E. W., Drew S. Days, III, Asst. Atty. Gen., Civ. Rights Div., Dept. of Justice, Washington, D. C., for U. S. Dept. of Health, Ed. and Welfare.
 Appeal from the United States District Court for the Middle District of Louisiana.
 Before TUTTLE, GEE and FAY, Circuit Judges.
 GEE, Circuit Judge:
 
 
 1
 As of November 1975, defendant East Baton Rouge Parish School Board (Board) maintained a standing policy of allowing outside organizations to use school facilities for meetings and gatherings during nonschool hours. Permission was granted on a first-come, first-serve basis, on condition of a modest rental and the payment of any overtime custodial or janitorial expenses occasioned. In granting permission for such use, no distinction between applicants was made on the basis of their political or ideological views, and organizations holding a variety of such views had in the past availed themselves of school facilities.
 
 
 2
 Early that month plaintiff-appellant, Knights of the Ku Klux Klan, Realm of Louisiana (KKK), a Louisiana nonprofit corporation chartered August 8, 1975, applied in due form for use of a high school gymnasium to hold what it termed a patriotic meeting on the night of Saturday, November 22. By letter of November 17, the Board granted permission for the meeting.[1] This letter was received by KKK on the following day, or shortly thereafter, and matters proceeded. This letter, together with the other communications between the parties to which we shall refer, will be found in the appendix to this opinion, as an exhibit to the factual stipulation of the parties printed there in full.
 
 
 3
 But the planned meeting was not to be, for wind of it had come to the Branch Office for Civil Rights[2] of the United States Department of Health, Education and Welfare in Dallas, Texas. On November 19, Dr. John A. Bell, Branch Chief in Dallas, telephoned the Board, confirming by telegram, that permitting use of school facilities for such a meeting would violate certain regulations[3] promulgated pursuant to the Emergency School Aid Act, 20 U.S.C. § 1601 Et seq. (ESAA). These regulations, partly quoted in the wire, denied federal funds to any educational agency permitting use of its facilities by a group "which discriminates against minority group children aged 5 to 17 inclusive, in its admissions or membership policies, or otherwise practices . . . discrimination against such children on the basis of race, color, or national origin . . . ." Dr. Bell's telegram continued with threats that if the KKK meeting were permitted he would "constitute (sic) enforcement proceedings seeking the termination of all ESAA funding to your district" and that the use would also violate Title VI and thus "trigger an enforcement action . . . to end all federal financial assistance to your district." The next day, November 20, faced with the loss of annual payments in the millions, the Board withdrew its permission for KKK to use the gymnasium.
 
 
 4
 The following day Dr. Bell, having observed the effect of his barrage, attempted a partial unfiring of the guns. In a wire to the Board, he suggested that the first amendment, as well as ESAA and Title VI, might be seen as cutting some figure in the Board's decision and that the Board should consider it too in determining what course to follow. He stated also that if the first amendment Required that KKK's use be permitted, such a use could not be grounds for enforcement action under any federal program. Thus, the Board was left to redetermine correctly, in a maximum of two days and arguably at its peril either way, the difficult issues with which we grapple today. Not surprisingly, it sat steady in the boat and took no action to reverse the cancellation.
 
 
 5
 Indeed, at the same meeting at which it had cancelled the KKK meeting the Board had also declared a moratorium on further use of school facilities by outside private organizations pending the fashioning of a new policy designed to avoid both the first amendment Scylla and the HEW Charybdis. And several months later, on February 19, 1976, the Board adopted its present policy. That policy, pertinent portions of which are set out in the Appendix, frankly discriminates among applicants on the basis of the content of the ideas they advocate and, arguably, on their membership and meeting-attendance policies. Among those excluded from use of the facilities are groups advocating racial discrimination, as KKK admittedly does. Plaintiff immediately amended its complaint to attack the new policy on first amendment grounds, as stigmatizing particular political preferences or beliefs and as "chilling" rights of freedom of speech, assembly and association.
 
 
 6
 At a hearing on April 20, 1976, the district court denied the preliminary and permanent injunctions requested by plaintiff against application to it of the new policy; ruled that the policy did not violate equal protection or improperly deny rights of speech, assembly or association; and dismissed the suit in its entirety. In so doing, the court observed from the bench that the facts in the case were stipulated and not in dispute. It also enunciated, as the basis for its ruling, its conclusion that while such views as the Board's new policy prohibited were constitutionally protected in their expression in any place "made public for multiple or general purposes," public school buildings were a special case. The court went on to state its belief that such views were contrary to the law of the land and that the Board could properly conclude and adopt as a policy that permitting the advocacy of such ideas on premises built and used for educational purposes might have a detrimental effect on the orderly use of them for these primary purposes.
 
 
 7
 We are thus presented on this appeal with one basic issue, our resolution of which would be dispositive: may an agency of the state, consistently with the Constitution, condition the off-time use of public school facilities on the political or ideological views of the applicant, on its membership policies, or perhaps on who may be permitted to attend its proposed function?
 
 Preliminary First Amendment Considerations
 
 8
 Our analysis first requires us to apply to the particular facts of this case the general "public forum" doctrine enunciated by the Supreme Court in Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972):
 
 
 9
 The nature of a place, "the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable." Although a silent vigil may not unduly interfere with a public library, Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time. Our cases make clear that in assessing the reasonableness of a regulation, we must weigh heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest.
 
 
 10
 408 U.S. at 116-17, 92 S.Ct. at 2303-04 (footnotes omitted) (emphasis added).
 
 
 11
 This is not difficult; indeed, the Board has resolved this matter for us by historically permitting, on a continuing and indifferent basis, the use of these facilities during non-school hours by private organizations. Thus, it would be difficult for the Board or any other party to maintain that afterschool meetings and similar activities in the facilities concerned interfere, as a general proposition, with their use or are inappropriate to it.
 
 Further First Amendment Contentions
 
 12
 Though we have ascertained that we treat of a facility dedicated to such uses as that proposed by KKK a public forum for such purposes appellees would have it that our first amendment inquiry is not concluded. They seek to distinguish use of the facilities by KKK from uses by other groups on several grounds: that such a use would hinder desegregation efforts, that the KKK meeting might lead to violence, that KKK is a "segregated" organization (in the sense that only whites may join), and that the rally may not have been open to all racial segments of the public.
 
 
 13
 Unfortunately for appellees' position at this stage of the proceedings, however, none of these contentions was advanced below. Nothing in any of appellees' pleadings so much as suggests any of them, nor did any appellee advance any of them in the reported arguments before the court below. No evidence was offered in their support, and such indications regarding them as may be found in the factual stipulation of the parties tend, with one exception (that KKK has never had a Negro member), to negative rather than to establish them. Thus, the contentions are entitled to little if any consideration by us now. On the remand which we order for trial on the merits, appellees may, of course, advance and seek to establish them to the extent that they are relevant to that proceeding as it develops. Appellees indeed urge such a remand, while appellant KKK urges that we declare the Board's new policy unconstitutional and permanently enjoin appellees from denying appellant use of the school facilities on the basis of it. As in Cason v. City of Jacksonville, 497 F.2d 949 (5th Cir. 1974), however, we are loath to adjudicate such grave constitutional issues on their merits when the factual development of the case is so sketchy. A remand for more full development seems the more prudent course. As we have determined to follow that course, we must now decide in what posture the matter should rest pending that hearing on the merits. Should a preliminary injunction issue?
 
 Temporary Injunctive Relief
 
 14
 Granting such relief requires that appellant have shown: (1) a substantial likelihood that it will prevail on the merits; (2) irreparable injury unless the injunction issues; (3) that the threatened injury to it outweighs whatever damage the injunction may cause the parties opposing it; and (4) that granting the injunction would not be against the public interest. Canal Authority v. Callaway, 489 F.2d 567 (5th Cir. 1974). None of these factors possess a fixed quantitative value; they are applied on a case-by-case, sliding-scale basis. Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others. Texas v. Seatrain International S.A., 518 F.2d 175 (5th Cir. 1975); Siff v. State Democratic Executive Committee, 500 F.2d 1307 (5th Cir. 1974). We consider the factors in the order given above.
 
 
 15
 1. Substantial Likelihood of Prevailing on the Merits. The Board's new or current policy contemplates that in comparable circumstances it will make school facilities available to some private groups and deny them to others. Generally speaking, equal protection considerations render such selective exclusions unconstitutional. See Stone, Fora Americana: Speech in Public Places, 1974 Sup.Ct.Rev. 233, 255 n.85.
 
 
 16
 In this case, our doubts about the constitutionality of the Board's policy are heightened by the touchstones which it selects for exclusion: advocacy of racial and religious discrimination or of governmental overthrow by force or violence is the first, without reference to the manner or setting of the advocacy or so much as a nod to the "clear and present danger" doctrine. This reason for exclusion is almost surely unconstitutional. Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Discriminatory membership policies of the applying group is the second. But, as we shall discuss at length later, it seems very dubious that such a consideration may be applied to deny the use for a few hours of a dedicated public forum, National Socialist White People's Party v. Ringers, 473 F.2d 1010 (4th Cir. 1973), or that a measure so directly contravening freedom of association could withstand the "close" scrutiny prescribed for such by Gilmore v. City of Montgomery, 417 U.S. 556, 575, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). Finally, the Board's policy may perhaps be read as requiring denial of use of school facilities for meetings which will be opened to the public on a racially or other invidiously discriminatory basis. See Cason v. City of Jacksonville, 497 F.2d 949 (5th Cir. 1974). The difficulty with applying this criterion to KKK's proposed meeting is that there is in the record no evidence whatever that the meeting would have been of this type. To the contrary, the meeting for which the Board cancelled use of its facility was stipulated by all parties to have been "scheduled, advertised and planned to be a public meeting, without any restriction on admittance." And the same is true of the appellees' belated contention that the meeting would have contemplated or occasioned violent conduct; the same stipulation states that the cancelled meeting "was scheduled, advertised and planned to be a completely peaceful meeting." Likewise, HEW's argument that KKK's after-hours use of the gymnasium will impede desegregation of the parish schools is supported by no evidence.
 
 
 17
 2. Irreparable Injury. KKK has been denied for almost three years the use of a public forum available to most others. This denial rests on a policy which is, as we have noted, of very dubious constitutionality. Citing language from Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965),[4] appellees suggest that KKK's first amendment rights have not been much impaired since it has merely been denied the use of a particular forum of its choice at the particular time it desired it. Of course, a more accurate statement would be that the Board's policy denies and has denied to KKK the use of Any school facility at Any time. And long before Cox, the Court had declared that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Schneider v. New Jersey, 308 U.S. 147, 163, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939). The Court has since found occasion to reaffirm this proposition in several opinions, E. g., Spence v. Washington, 418 U.S. 405, 411 n.4, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); Grayned v. City of Rockford, 408 U.S. 104, 118 n.40, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). And as we have noted, the Board seems to concede that the gymnasium in question, after hours, is an "appropriate" place for the expression of most views, so that we do not deal with the situation of one who insists on a right to address a library reading room or to hold a mass meeting at a public intersection during rush hours.
 
 
 18
 Moreover, there are hints from the Court, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and holdings from lesser tribunals, A Quaker Action Group v. Hickel, 137 U.S.App.D.C. 176, 421 F.2d 1111 (1969); Cobb v. Beame, 402 F.Supp. 19 (S.D.N.Y.1975), that denial of first amendment rights may in itself constitute irreparable injury in some circumstances. Certainly the denial here is broad and lengthy, as much so as lies in the Board's powers. Having by its new policy denied use of any of its facilities to KKK forever, it can do no more.
 
 
 19
 We conclude that this prior restraint on the exercise of first amendment rights in a dedicated public forum being severe, broad and longlasting may properly be viewed as inflicting irreparable injury.
 
 
 20
 3. Balancing the Relative Injuries. We have noted above the injury suffered by KKK as a result of the Board's likely unconstitutional policy regarding use of its facilities. If the policy is in fact invalid, then KKK is and has for almost three years been improperly barred from exercising its first amendment rights in a generally available public forum. We cannot regard such selective muzzlings lightly; to the contrary, in our constitutional scheme of things they are viewed very gravely indeed.
 
 
 21
 HEW and the Board can muster little to cast in the balance's other pan. As for the Board, it seems plain that but for Dr. Bell's threats of financial ruin the November 22, 1975, meeting would have gone off like any other and there would have been no such policy at all. And as for HEW, it advances only a supposed interference with its capability to enforce "statutes which proscribe racially discriminatory Acts (emphasis supplied) that may undermine school desegregation." There being little or no evidence in the record that any such act unless the peaceful advocacy of ideas that someday, somehow may eventuate in one be such would ensue upon use of the forum in question by KKK, we are not much impressed by this contention.
 
 
 22
 4. Would an Injunction be Against the Public Interest? Several public interests are involved here. The first is that unfashionable, even pernicious and mischievous, ideas should be admitted to the marketplace. A more futile exercise in redundancy can scarcely be imagined than the citation of authority in support of this proposition. The state may require that the vending of such wares be peaceable, it may pray fervently that no one will buy them; what it may not do is exclude them from the public forum by a prior restraint, as it is all too plain appellees have sought to do in this case:
 
 
 23
 If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . . If there are any circumstances which permit an exception, they do not now occur to us.
 
 
 24
 West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) (footnote omitted). See also Collin v. Smith, 578 F.2d 1197 (7th Cir. 1978). The benefits of the first amendment are often hard to see, its gifts frequently unwelcome to the majority of the time, but the interest that thinks to make head against it must be a compelling one indeed.
 
 
 25
 Against this policy appellees would range two others: that in prohibiting racially discriminatory acts which may impede desegregation and that in avoiding any state involvement in forwarding KKK's invidious racial views. These too are weighty considerations, but if they are much involved here appellees have not shown it.
 
 
 26
 As we observed above, such evidence as is in the record indicates that KKK's proposed and cancelled meeting the only one about which there is any evidence was to have been open to the public generally. It is true that the record contains an indication that KKK has a discriminatory membership policy: no Negro has ever been a member in the corporation's three-year history.[5] But if this policy, assuming it exists, be the discriminatory "act" to which HEW refers, it is hard to see how the Board's facility-use policy could affect it.
 
 
 27
 A more logical concern is that the state, in the person of the Board, might be seen as acting to forward KKK's views and policies by permitting any use of its facilities by such an organization. It is certainly true that significant state action in support of such things is prohibited, E. g., Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (leasing of state-owned restaurant area for exclusive use by discriminating operator); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (discriminatory primary held by dominant political party); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (state enforcement of private racial covenants).
 
 
 28
 But the weight of authority seems to be that merely permitting the occasional and temporary use of state facilities by racially discriminatory groups along with all others does not constitute significant state involvement in their practices. For though the state must not be significantly involved in forwarding such practices, at the same time it is not its place to anathematize private groups which pursue them. At some level of minor state involvement, considerations of freedom of association become paramount. Bigots, even groups of bigots, may not be outlawed for their behavior excluded from use of public sewers, streets or fora, or denied fire or police protection. As the Court observed in Moose Lodge v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972), "(t)he Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State . . . ." And in Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), a case not involving freedom of speech, the Court distinguished what amounted to a making over of entire public recreational facilities to the exclusive possession of segregated private groups from lesser state actions. Though it invalidated the former, it cautioned that the exclusion of any group, "all-Negro, all-Oriental, or all-white," from public facilities infringes freedom of association and "must withstand close scrutiny." 417 U.S. at 575, 94 S.Ct. at 2427.
 
 
 29
 We conclude that enjoining a selective denial of a dedicated public forum to a group because of its ideas or membership policies would forward and not contravene the public interest. Properly analyzed, there is simply No state involvement here in KKK's ideas or practices, whatever they may be, and no state action endorsing them. For here, the decisive action of the state was an indifferent one, analogous to dedicating a public park: it threw open the doors of the gymnasium in question for after-hours use by all comers, on a first-come, first-serve basis. Thereafter, its only additional function was the housekeeping one of scheduling determining who came first to apply for a particular time. National Socialist White People's Party v. Ringers, 473 F.2d 1010 (4th Cir. 1973). Thus, the state is here no more involved in or responsible for the views expressed or for the composition of the groups which express them in the forum which it created than the United States is in who makes speeches or holds demonstrations on the Mall. Instead, it is appellees who would have the state take a hand in the matter by franking those whose ideas and policies it finds suitable for public expression and gagging those it does not and this in the name of equal protection and civil rights. We do not find this an attractive suggestion.
 
 Conclusion
 
 30
 We conclude that this case was improvidently dismissed on its merits, and we therefore remand it for trial. We further conclude, since appellant has for the present sufficiently established the four factors required for a temporary injunction under Canal Authority, supra, that such an injunction must issue forthwith against enforcement of the Board's policy against appellant KKK, pending the hearing on the merits. The cause is
 
 
 31
 REVERSED AND REMANDED.
 
 
 
 [1]
 A communication not without its ironies, advising as it did "that the burning of crosses on school premises is strictly prohibited . . . ."
 
 
 [2]
 As noted, the record contains ironic features
 
 
 [3]
 45 C.F.R. 185.43(d)(3)
 
 
 [4]
 The Holding of which can scarcely give appellees much comfort
 
 
 [5]
 One may well wonder why any would wish to