**COUNTRY HILLS CHRISTIAN CHURCH, et al., Plaintiffs,**

v.

**UNIFIED SCHOOL DISTRICT NO. 512, JOHNSON COUNTY, STATE OF KANSAS, a/k/a Shawnee Mission School District, et al., Defendants.**

Civ. A. No. 82–2345.

United States District Court,
D. Kansas.

March 29, 1983.

On Motion for New Trial April 28, 1983.

Dan M. Peterson, Barbara Luann Ridgeway, Gulf & Great Plains Legal Foundation of America, Kansas City, Mo., Marvin E. Rainey, Rainey & Wiglesworth, Overland Park, Kan., for plaintiffs.

Robert F. Bennett, John L. Vratil, Bennett, Lytle, Wetzler, Winn & Martin, Prairie Village, Kan., for defendants.

## MEMORANDUM & ORDER

SAFFELS, District Judge.

This is a lawsuit for a declaratory judgment and permanent injunction ordering defendants to make the facilities of the Shawnee Mission School District open to plaintiffs for purposes of religious worship on the same basis as it does to non-religious groups. The case turns on three questions. (1) Have the defendants created a public forum? (2) Can the defendants constitutionally deny a group access to a public forum because the group intends to put the forum to a religious use? (3) Does the Establishment Clause of the First Amendment prohibit defendants from allowing religious uses of their facilities on the same terms and conditions as apply to other groups? The case was tried to the court. The facts are not in great dispute. The court finds for plaintiffs and will issue a permanent injunction.

I

FACTS

1. Plaintiff Country Hills Christian Church [hereinafter Country Hills or the Church] is a Kansas not-for-profit corporation which has been organized and operated as a religious and church organization since 1979. The Church is non-denominational, but is loosely linked with some other churches. The Church has sixty-five (65) members.

2. Pastor Larry D. Kuhl has been minister of Country Hills since April of 1980. Plaintiffs Kenneth M. Keller and Harry Cook, III are parishioners of Country Hills.

3. Defendant Unified School District No. 512, Johnson County, State of Kansas [hereinafter Shawnee Mission School District or the School District] is a political subdivision of the State of Kansas, organized under Chapter 72 of the Kansas Statutes Annotated.

4. The School District's Board of Education [hereinafter Board] is composed of Tom J. Rawlings, Laura Hendricks, Kenneth R. Bayer, Donald A. Culp, Joan Bowman, Ann Burns and Richard G. Spears. Mr. Rawlings is the current President of the Board, serving a one-year term which began on July 1, 1982, and will expire on June 30, 1983. The previous president was Cynthia O'Connell, now deceased.

5. Defendant Raj K. Chopra is the Superintendent of Schools for the School District.

6. Defendant Calvin C. Cormack is an Associate Superintendent of Schools for the School District. From the spring of 1982 until November 1, 1982, Dr. Cormack was the Acting Superintendent of Schools. The prior superintendent of schools was Dr. Arzell Ball.

7. The principal administrative offices of Country Hills are located within the geographical boundaries of the School District.

8. Country Hills has never had facilities of its own for purposes of Sunday morning worship and Sunday school. The Church plans to build its own building, and has

purchased property on which to build. The future site for the building is located within the boundaries of the School District, and is about half paid for. The Church has obtained model architectural plans, has consulted with a student architect, has consulted a corporation which specializes in constructing buildings for church congregations, and has met with other persons regarding its building plans.

9. Until April, 1980, the Church conducted Sunday morning worship services at the Hilltop Dance Studio in Lenexa, Kansas. It was unattractive for worship purposes. The congregation met in a basement, which leaked when it rained. The room used for the Sunday service had mirrors all the way around it, which some considered distracting. The staircase into the basement was difficult for elderly persons to descend, and there was a noise problem during worship services because of a loud furnace and air conditioning system. The Sunday school met in a single room. The nursery was confined to a small office.

10. From April, 1980, until December, 1981, the Church met at Ryckert's Hall in Lenexa, Kansas. This location also had some disadvantages. It was difficult for elderly persons to use the stairs leading to the room used for services on the second floor. There was a ramp leading to the worship area which was difficult for elderly persons and women in high heels. The building was rather rickety, and noise from nearby trains, including loud train whistles, interfered with the worship services. The entrance was difficult for visitors to locate. Convenient parking was limited.

11. From December, 1981, until the present, Country Hills has met at the La Petite Day Care Academy in Lenexa, Kansas. The room in which the congregation worships is too small to accommodate significant growth in attendance and has an odd shape. Parking is a problem, and parishioners often have to double-park behind one another. The decor of the room is not conducive to a proper atmosphere for worship. The walls are covered with depictions of cartoon characters, pre-school artwork, and other items for small children.

12. Country Hills has submitted requests to the School District for permission to rent space at the Mill Creek Elementary School for Sunday morning services on six occasions. All six of these requests have been for "special Sundays" on which the Church hoped to attract new visitors or hoped for a larger-than-usual attendance. Country Hills has never requested to rent facilities of the School District for a continuous series of Sundays or on a long-term basis.

13. All six requests have been denied on grounds that they would violate the policies of the School District which allow church organizations to rent School District facilities only for "non-religious meetings."

14. The School District is authorized by K.S.A. 72–8212 to open its facilities for use by school and non-school groups. The School District "may open any or all school buildings for community purposes, and may adopt rules and regulations governing such use of school buildings." *Id.*

15. The School District has in effect certain "General Policies and Regulations" or "General Policies and Procedures" which govern the use of school facilities by non-school groups, and constitute the official policy of the School District with respect to such use.

16. Policy No. 2000 states in part as follows:

"... When school facilities are not in use for school programs, they may be made available at reasonable times and reasonable rates to recognized community organizations whose activities are of general interest to the community and whose use of the school facility is for a community purpose. 'Community purpose' includes but is not necessarily limited to educational, cultural, political, and recreational activities generally open to the public at large...."

17. Pursuant to Policy No. 2020, certain groups or organizations that are not school-related, that are not organized primarily for the benefit of the School District, and

whose primary purpose is other than that of enhancing the educational purpose and process of the School District are classified as Category "B" Organizations and are routinely permitted to rent the facilities of the School District. Category "B" Organizations include such groups as recognized political parties, the Y.M.C.A., the Y.W.C.A., community homes associations and church organizations.

18. School district facilities have been rented by non-school groups on many occasions.

19. Non-school groups which have used these facilities pursuant to the policies include the Democratic party, a Hebrew academy, some homeowner associations, the Voice of Reason, the Y.M.C.A., the Y.W.C.A., the Optimists, the Fellowship of Christian Athletes, and various sports leagues.

20. Area churches have been permitted to use School District facilities. On three occasions after 1969, the Trinity Lutheran Church of Mission, Kansas, rented and used the auditorium of the Shawnee Mission West High School for worship services, including Holy Communion services. On January 27, 1980, for example, the Trinity Lutheran Church rented and used the auditorium of the Shawnee Mission North High School for worship services, including Holy Communion and a catered dinner. These religious uses occurred with the knowledge and consent of Dr. Ball, the Superintendent of defendant School District.

21. Country Hills requested to use the multi-purpose room of the Don Bonjour Elementary School in early November, 1980. This request was initially granted. When the Church found it necessary to reschedule the initial date until December 7, 1980, Pastor Kuhl contacted the School District administration by telephone. In the course of that conversation, it was revealed that the requested use was for a worship service. Permission to rent the facility was therefore denied.

22. The Church submitted a request to use the multi-purpose room at the Mill Creek Elementary School for Sunday school and worship services on Easter Sunday, April 11, 1982.

23. On March 18, 1982, Dr. Arzell Ball, Superintendent of Schools, advised Pastor Kuhl that the request could not be granted because it would violate the policy against religious use.

24. By letter dated March 29, 1982, the Church requested use of the Mill Creek Elementary School on Sunday, May 9, 1982 (Mother's Day).

25. By letter dated March 30, 1982, Dr. Ball advised Pastor Kuhl that the matter had been referred to the school district's legal counsel, and that until the opinion of counsel was received, it was "impossible for the school district to ... negotiate or agree upon any lease agreements."

26. By letter dated April 8, 1982, counsel for the School District rendered its opinion to the Board pertaining to the use of public school property for religious purposes. In essence, counsel concluded that allowing school facilities to be regularly or routinely used for religious purposes would be prohibited by the Establishment Clause of the First Amendment, but the present policy allowing "singular and emergency use of school facilities, if authorized by the board" would not violate the Establishment Clause.

27. Easter Sunday passed without any action on Country Hills' request being taken by the board. As a result, Country Hills was denied the use of the Mill Creek Elementary School facilities for worship purposes on April 11, 1982.

28. By letter dated April 19, 1982, to Ms. Cynthia O'Connell, then President of the Board of Education, Pastor Kuhl requested that the Board amend its policies in six particular respects to permit the facilities of the School District to be used by religious groups subject to certain conditions.

29. The matter was considered at the April 26, 1982, meeting of the board. Pastor Kuhl urged the Board to allow churches to use the facilities of the School District for religious purposes on the same basis as other non-profit organizations. A written resolution had already been prepared prior

to the meeting and was adopted verbatim by the board. The resolution expressed concern that if school facilities were used by non-school religious groups it would be "quite possible" that a student would assume that such religious activities were approved of or supported by the School District, and that the adoption of procedures for use of school facilities by religious groups could foster excessive entanglement with religion.

30. The Board directed the attorneys for the School District to prepare revisions to Policy No. 2000 to allow use of senior high school attendance facilities for religious purposes, upon specific approval of the board, where:

(1) an emergency exists;

(2) the facility or meeting place of the organization has been destroyed or rendered untenantable;

(3) no other facility is reasonably available for use by the organization;

(4) the request is for a specific date or dates and a specific location;

(5) the hours of use will not occur immediately before, during or after any scheduled activity involving students that is being conducted at the senior high schools; and

(6) the applicants will pay all costs and expenses of the requested use, including all charges for restoring the premises for school purposes.

31. On or about July 12, 1982, the Board revised its policies by the adoption of a new Policy No. 2061, which closely followed the terms of the April 26 resolution.

32. Pastor Kuhl again requested use of the facilities of the Mill Creek Elementary School for religious services for Sunday, November 21, 1982 (Thanksgiving Sunday) and Sunday, December 19, 1982 (Christmas Sunday).

33. By letter dated October 18, 1982, Dr. Cormack, Acting Superintendent, stated that he assumed the requested use was "for the purpose of conducting Sunday worship services," and that "under School District policy, the use of school facilities for reli-

gious purposes is clearly prohibited except on an emrgency [sic] basis. Board Policy No. 2061 further specifies those circumstances that would constitute an emergency basis. Therefore, unless you are facing an emergency, your request must be denied."

34. By letter dated December 10, 1982, Pastor Kuhl requested that Country Hills be permitted to rent the facilities of the Mill Creek Elementary School for Sunday worship services on April 3, 1983 (Easter Sunday).

35. By letter dated December 15, 1982, Mr. Jack Hammig, Director of Facility Use, sent a letter to Pastor Kuhl denying his request.

36. Country Hills is a "recognized community organization" as that term is used in Policy No. 2000, and, but for the limitation regarding religious worship, Country Hills would be permitted use of the facility under the policies.

37. Country Hills is a "church organization," and, but for the limitation to "non-religious meetings" contained in the Paragraph (2) of Policy No. 2020, would be considered as a Category "B" group for purposes of using the facilities of the School District.

38. School District Policy No. 2061 provides:

"Emergency Use for Religious Purpose:
"A group or organization shall not be permitted to use school facilities for religious worship or other religious purposes except in the case of an emergency, and then only with specific approval of the Board of Education. An 'emergency' is defined as an unforeseen combination of circumstances, or the resulting situation, that requires immediate action. A request for emergency use of school facilities for religious purposes will be granted by the Board only under the following conditions:

"(1) An emergency exists;

"(2) The facility or regular meeting place of the group or organization has been destroyed or rendered untenantable;

"(3) No other facility in the community is reasonably available for use by the group or organization;

"(4) The request is for use of a senior high school facility on a specific date or dates;

"(5) The period of use will not occur immediately before, during, or after any scheduled activity involving students at the senior high school in question; and

"(6) The applicant will pay all costs and expenses of the requested use, including all charges for restoring the premises for school purposes.

"The group or organization requesting facility use shall be required to demonstrate, to the satisfaction of the Board that the above-listed conditions exist or will be fulfilled."

39. Country Hills cannot meet the terms and conditions imposed by the School District under Policy No. 2061 for use of its facilities because:

(a) The need by Country Hills and the other plaintiffs to use the facilities of the School District on special Sundays is not "an unforeseen combination of circumstances" and is not an emergency.

(b) Use of school facilities requires "specific approval of the Board of Education," but the Board has not approved a single request by Country Hills to date, and has not evidenced any intention of doing so.

(c) Policy No. 2061 requires that the "facility or regular meeting place of the group or organization has been destroyed or rendered untenantable." The Church's regular meeting place has not been destroyed or rendered untenantable.

(d) Policy No. 2061 requires that "no other facility in the community is reasonably available for use by the group or organization." While the facilities in which Country Hills is currently meeting are not satisfactory, other facilities are available to Country Hills.

(e) Policy No. 2061 limits use for religious purposes to "a senior high school facility," but Country Hills has requested use of an elementary school facility.

40. On several occasions, Christian Scientists have requested use of the School District's facilities for purposes of public lectures. These requests were summarily denied, because the person receiving the requests, Mrs. Joyce Drummond, felt that she was well-enough acquainted with typical Christian Scientist lectures to determine that they are religious in character and should be denied under the Board's policies.

41. There are no guidelines in existence for distinguishing between "religious" and "non-religious" meetings. The President of the Board of Education, the Superintendent of Schools, and the Director of Facility Use gave conflicting answers as to whether certain types of activities would be considered "religious" or not.

42. The current rate for rental of the gymnasium at the Mill Creek Elementary School is Six and 70/100 Dollars ($6.70) per hour on Sundays.

43. Any supervisor to be appointed for Mill Creek Elementary School on Sundays would be charged to the user at the rate of Six Dollars ($6) per hour.

44. In the event that additional security is warranted, the School District's charge for a security guard is Six and 30/100 Dollars ($6.30) per hour.

45. Rental charges for use of School District facilities have recently been revised, and are designed to reflect additional out-of-pocket costs to the School District resulting from the rental. The rental charge includes a charge for electricity, janitorial services, and for administrative processing.

46. The School District has no recollection of a cash deposit or bond ever being required of a non-school group.

47. The current policies do not require a supervisor to be appointed for use of an elementary school on Sunday, unless an athletic contest is to be played. Supervisors

are sometimes required for other uses, however, as when a large part of a building is used or a school has problems with vandalism.

48. Fees for facility rental are payable at any time prior to the time of the requested use.

49. The School District operates five (5) senior high schools, ten (10) junior high schools, and forty-five (45) elementary or grade schools. Students attending the senior high schools are generally between the ages of fourteen (14) and eighteen (18) years of age. Students attending the junior high schools are generally between the ages of twelve (12) and fourteen (14) years of age. Students attending the elementary schools are generally between the ages of Five (5) and twelve (12) years of age. Students are permitted inside elementary school facilities on school days from 7:45 a.m. until 3:45 p.m. Secondary school hours are from 7:15 a.m. until 4:15 p.m. Student extra-curricular activities are permitted at other times on a liberal basis.

50. In addition to scheduled usage of the School District's facilities, the playground area immediately adjacent to each school building is constantly open to use by children and adults at all hours and on all days when school is not in session. When school is not in session, these facilities are utilized, particularly elementary school play areas, by elementary school children living in the immediate neighborhood.

## II

## DISCUSSION

A. Have the defendants created a public forum for non-school groups?

Defendants have made available their school buildings and facilities to non-school community organizations at a reasonable rent. Groups as diverse as the Democratic Party and the Y.M.C.A. make use of defendants' buildings. Community groups use these buildings for singing songs, cooking group suppers, staging theatrical productions, playing basketball and airing their political and moral views. For example, the court heard testimony about the Voice of Reason meeting at night on December 7, 1982, at Indian Hills Junior High School, at which meeting school prayer, sex education and abortion were discussed.

The traditional public forum is a park or a public street. The First Amendment, through the Fourteenth, prohibits a state from abridging or denying use of a street or park for purposes of assembly, communication and discussion of public questions. *Hague v. Committee on Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Use of the streets or parks may be subject to reasonable time, place and manner restrictions [*Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941)], but only to the extent necessary to avoid a threat to public safety, peace or order. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Streets and parks are not the only public places subject to the protection of the First Amendment. A public library may be a public forum, and, in some cases, a local government must allow its library to be used as a stage for political expression. *Brown v. Louisiana,* 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966). A railroad station is a public forum [*In re Hoffman,* 67 Cal.2d 845, 64 Cal.Rptr. 97, 434 P.2d 353 (Cal.1967)], and a municipal bus terminal is a public forum [*Wolin v. Port of New York Authority,* 392 F.2d 83 (2nd Cir.1968)], while a city-owned bus is not. *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). A municipally-owned theater is a public forum. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Even a privately-owned shopping center can be a public forum. *Amalgamated Food Employees Union v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). *But see Lloyd Corp., Ltd. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

A public school is a public forum for its students and teachers. *Tinker v. Des*

*Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). If it is opened to the school district community for meetings and discussions during non-school hours, then it becomes a public forum for the community. *Knights of the Ku Klux Klan, Realm of Louisiana v. East Baton Rouge Parish School Board,* 578 F.2d 1122 (5th Cir.1978); *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir.1973); *Lawrence University Bicentennial Commission v. City of Appleton, Wis.,* 409 F.Supp. 1319 (E.D.Wis.1976).

█ Defendants, by and through their Policies Nos. 2000 and 2020, have created a public forum for the exercise of First Amendment rights. The forum is open to "recognized community groups." The dedication of school district facilities as a public forum for community groups makes the school buildings virtually the same, in concept, as streets and parks as far as the First Amendment is concerned.

This does not mean, however, that school buildings cannot be regulated to a greater degree than parks and streets. The nature of the school building, its function in the community and the activities normally conducted there, dictate that reasonable regulations of time, place and manner of use by community organizations may be imposed. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Defendants allege that if the court allows the Country Hills Christian Church to use Mill Creek Elementary School on Easter Sunday, the floodgates will be opened and the court must also order them to allow into their buildings snake cults, groups that practice animal sacrifices, groups that wear odd clothes, and groups that use smoke and fire in their worship services.

That is a bridge the court does not have to cross at this time. From the evidence, the court finds that plaintiffs conduct worship services of a more tame variety. Nevertheless, if defendants find that the handling of poisonous reptiles, fire and smoke, or the use of alcoholic beverages in a religious service conducted in a school building are activities which should be regulated, the First Amendment should pose no obstacle so long as the regulations are reasonable.

**B.** Having created a forum and opened it for community use, can defendants exclude from that forum groups who desire to engage in religious worship?

█ Religious worship and discussion are "forms of speech and association protected by the First Amendment." *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Once a forum is opened to assembly or speaking by some groups, a school district may not prohibit other groups from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content. *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). The First Amendment prohibits excluding groups from a public forum based on the content of the group's intended speech even where the government was not required to create the forum in the first place. *Widmar v. Vincent, supra,* 454 U.S. at 263, 102 S.Ct. at 269, 70 L.Ed.2d 440.

█ Defendants review requests to use School District facilities to determine whether or not each group will be engaging in religious worship. If the group is deemed to be making a request to use the School District facilities for a non-religious use, then the group's request is granted. If defendants determine the group will make religious use of the building, permission is denied. Plaintiffs fall into the latter group. Defendants have denied plaintiffs access to a public forum solely because of the content of plaintiffs' proposed speech. This is a violation of the First Amendment. *Police Department of the City of Chicago v. Mosley, supra,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212; *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 268, 95 L.Ed. 267 (1951).

█ Defendants' primary function, that of educating children, does not exempt them from the provisions of the First

Amendment. The First Amendment extends to public schools [*Tinker v. Des Moines Independent Community School District, supra,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731], and unconstitutional exclusion of those who wish to use school buildings cannot be rationalized by reference to the school setting. "School desks and blackboards, like trees [in a park] or street lights [on a street], are but the trappings of the forum; what imports is the meeting of minds and not the meeting place." *Danskin v. San Diego Unified School District,* 28 Cal.2d 536, 171 P.2d 885, 898 (Cal.App.1946).

Defendants argue that children are impressionable and easily confused. They argue that children who attend Sunday school in the same building as their public school classes will come to feel that the School District endorses their church. Defendants argue that a child who attends Sunday school at a church may feel that the School District disapproves of his church because another sect is permitted to rent the child's school building during non-school hours. Defendants further argue that children will acquire an irreconcilable conflict between an apparently school-district-approved sect and their family's religion and church. This may or may not be true. There is no evidence in the record to support these contentions. Dr. Cormack, School District Psychologist, testified that he believed these contentions to be true, but he admitted that no empirical evidence existed in support of his theories and that no studies had been done to verify them. The court finds his testimony to be speculative and declines to give it any weight. *Compare Brown v. Board of Education of Topeka,* 347 U.S. 483, 495 at n. 11, 74 S.Ct. 686, 692 at n. 11, 98 L.Ed. 873 (1954) (claim of psychological effect on children "amply supported by modern authority").

C. Does the Establishment Clause of the First Amendment allow the School District to deny to the plaintiffs access to their school buildings when plaintiffs seek to use the buildings for religious worship?

 The Establishment Clause requires the School District to be neutral in its relations with groups of religious believers, but does not require the School District to be an adversary to religious groups. The court finds the School District may not close their doors to groups who wish to rent School District facilities for purposes of religious worship during non-school hours, and that the Establishment Clause provides no defense to this action.

The First Amendment provides: "Congress shall make no law respecting an establishment of religion...." This prohibition also applies to the state of Kansas and its public bodies and political entities, such as the defendants. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). Many cases discuss the Establishment Clause, but *Everson, supra,* serves as the common beginning of all modern Establishment Clause controversies.

*Everson* arose from a New Jersey statute authorizing reimbursement to parents for the cost of transporting their children to school on regular public transportation buses. Some of these reimbursements went to parents of children who attended Catholic schools. The highest court of New Jersey found no violation of the First Amendment. The United States Supreme Court affirmed.

The court discussed the history and meaning of the Establishment Clause. A government may not tax, support or otherwise assist any or all religions or interfere with the beliefs of any religious groups. *Id.* at 16, 67 S.Ct. at 511. The government cannot tax, in any amount, to support any religious activity or institution. *Id.* The clause against establishment of religion was intended to erect a wall of separation between church and state. *Id.*

On the other hand, a state may not hamper its citizens in the free exercise of religion. *Id.* Therefore, that court held that New Jersey was not prohibited from spending tax money to pay the bus fares of children attending parochial schools. If the state were forced to cut off these direct payments, as well as other state services such as public sidewalks, sewage disposal

and police protection, it would be far more difficult for the parochial schools to operate, and this was not the purpose of the First Amendment.

The First Amendment was held to require only that the states be neutral in their relations with religious groups and non-religious groups. The First Amendment no more requires state governments to handicap religions than it does to favor them. *Id.* at 18, 67 S.Ct. at 512.

■ The wall between church and state is a variable barrier depending on all the circumstances of a particular relationship. *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). The First Amendment does not require that in every and all respects there shall be a separation of church and state. Rather, it defines the manner in which there shall be no dependency or union of one with the other. *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952). Church and state need not be hostile or unfriendly to one another. *Id.* at 314, 72 S.Ct. at 684.

■ The problem of separation of church and state is one of degree. *Id.* A public school may not turn its classrooms over to religious instructors during school hours. *Illinois v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948). A public school may accommodate its schedule to a program of outside religious instruction, however. *Zorach v. Clauson, supra.*

■ A government may not write or sanction an official prayer, nor may they require such a prayer to be recited in public schools. *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). The state may, however, officially encourage students to recite historical documents which express belief in a deity and sing official songs or anthems which contain professions of faith in a supreme being. *Id.* at 435, n. 21, 82 S.Ct. at 1269, n. 21.

■ The government may not require the selection and reading at the opening of the school day of verses from the Bible and the recitation of the Lord's Prayer by the students in unison. *Abington School District v. Schempp* and *Murray v. Curlett,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). There is no prohibition, however, against voluntary religious services in government facilities by paid government religious leaders in a military setting. *Id.*

■ A state may not prohibit public school teachers from teaching evolution as a scientific theory. *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). Nevertheless, the Establishment Clause does not foreclose public school classes from non-devotional use of the Bible in literature, humanities, social sciences or history classes. *Abington School District v. Schempp, supra,* 374 U.S. at 300, 83 S.Ct. at 1612 (Brennan, J., concurring).

■ The School District argues that it cannot rent its facilities to recognized community organizations for purposes of religious worship without violating the Establishment Clause of the First Amendment. An equal access policy will not violate the Establishment Clause, however, if it passes a three-pronged test:

(1) Would an equal access policy have a secular legislative purpose?

(2) Would the principal or primary effect of an equal access policy be one that neither advances nor inhibits religion?

(3) Would an equal access policy foster an excessive School District entanglement with religion?

*See Widmar v. Vincent, supra,* 454 U.S. at 271, 102 S.Ct. at 275. *Lemon v. Kurtzman, supra,* 403 U.S. at 612–13, 91 S.Ct. at 2111.

1. While defendants argue an equal access policy has no secular purpose and accuse plaintiffs of "semantic biplay" in this regard, the court finds an equal access policy would have a secular purpose. School District General Policy and Procedure No. 2000 has the avowed purpose of opening school facilities to community organizations for educational, cultural, political, recreational and other activities providing that they are generally open to the public. These are entirely secular purposes, all com-

munity organizations are welcome if their activities are open to the members of the community. Defendants do not undertake to endorse these groups nor promote their views or ideals. Allowing equal access to school facilities by religious groups for purposes of worship will not undermine these secular purposes.

2. The principal or primary effect of an equal access policy would neither advance nor inhibit religion. It is possible that religion and certain religious groups may benefit from access to School District facilities, but this is not the direct effect of the equal access policy; it is merely an incidental effect. The equal access policy would at most only make available to all community groups the benefits of School District facilities regardless of the religious nature of their speech. The benefit flows to each group generally, religious or not, but not to religion or any religious group specially. *See Board of Education v. Allen,* 392 U.S. 236, 244, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968). Religious groups share benefits with all other community groups. If religious groups benefit, it is in spite of, rather than because of, their religious character. This is not a violation of the Establishment Clause. *Abington School District v. Schempp, supra,* 374 U.S. at 301, 83 S.Ct. at 1613 (Brennan, J., concurring). *See also, Widmar v. Vincent, supra,* 454 U.S. at 273, 102 S.Ct. at 276.

3. The open access policy would avoid entanglement with religion. The present policy of excluding religious worship as an acceptable use of defendants' facilities risks much greater entanglement by attempting to determine what speech and actions constitute religious worship. Mr. Hammig, Director of Facility Use for the School District, testified that under the present policy he must determine whether or not a community group wishing to use school facilities is going to engage in worship.

At present, Mr. Hammig allows community groups to sing Christmas carols only if they have independent cultural significance apart from their religious nature. Community groups may hold chile suppers under present guidelines and may pray before the meal is eaten. Courses in Jewish studies may be held during the evenings as long as the persons attending only talk about religion, but do not engage in religious practices. Under Mr. Hammig's authority, however, vespers and other religious services have been held at School District high schools.

Mr. Rawlings, President of the Board of Education, testified that the present policy would allow community groups to hold Christmas concerts as long as the songs were not religious. "Rudolph, the Red Nosed Reindeer" is acceptable, while "Oh, Holy Night" is not. Groups may be allowed to conduct meetings in School District buildings to discuss and study a particular religion, but a Bible study group might be too religious to allow. As a practical matter, Mr. Rawlings would deny use of School District facilities if such use would lead to a public outcry. Mr. Rawlings does not feel that use of School District facilities by plaintiffs would cause a disturbance or serious problem within the district.

Mr. Chopra, Superintendent of the School District, testified that under current policies, a religious use is determined without any identifiable guidelines. A community group may use School District facilities for musical productions so long as they do not contain too much of a religious nature. "Oklahoma" would be an acceptable musical production; "Jesus Christ—Superstar" would be very questionable, and a group who wished to sing hymns in a school building would never be allowed.

The present policy presents an unacceptable degree of entanglement with religion by the School District because of enforcement of its policy of exclusion of religious worship. The School District must determine in every questionable case what words and conduct constitute religious use or religious worship. Of course, this is "an impossible task in an age where many and various beliefs meet the constitutional definition of religion." *O'Hair v. Andrus,* 613 F.2d 931, 936 (C.A.D.C.1979). An open access policy would eliminate the need for the School

District to determine what uses are religious and what uses are not religious.

■ "Entanglement" refers not only to the day-to-day interaction between government and religion; it also refers to the effect of government policies toward religion. In the end, the test for entanglement is one of degree. The question is whether or not a government policy calls for "official and continuing surveillance" or excessive government involvement in religious organizations. *Walz v. Tax Commission,* 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970).

"Entanglement" refers to either a governmentally-established religion or governmental interference with religion. Avoiding excessive entanglement does not require "perfect or absolute separation" of church and state *[id.];* there is "room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship" by the government. *Id.* A school district does not engage in excessive entanglement if it maintains a "kind of benevolent neutrality toward churches and religious exercise generally." *Id.* An open access policy would, at most foster such a benevolent neutrality, but would not subject defendants to an unconstitutional level of entanglement.

## III

## CONCLUSION

The court concludes that by allowing their facilities to be used during non-school hours by non-school community groups, defendants have created a public forum. Having created a public forum, defendants cannot exclude plaintiffs from the forum because of the religious content of plaintiffs' intended speech unless such exclusion is justified under applicable constitutional case law. Defendants have not and cannot justify their policy of exclusion. The Establishment Clause does not justify excluding plaintiffs' religious services from School District buildings, and there is no evidence either that children will be harmed or that defendants risk placing an imprimatur of approval on religious sects which rent School District facilities.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered in favor of plaintiffs and against defendants, and that:

(1) School District Policy No. 2020 is hereby declared unconstitutional and void insofar as it purports to prohibit community organizations from using the facilities of the School District for religious worship; and

(2) School District Policy No. 2061 is hereby declared unconstitutional, void and of no effect; and

(3) Defendants, and each of them, are hereby ORDERED to permit plaintiffs to use School District facilities on April 3, 1983, and thereafter, for religious purposes during non-school hours on the same terms and conditions as other recognized community organizations whose activities are of general interest to the community; and

(4) IT IS FURTHER ORDERED that the Country Hills Christian Church is and shall be treated as a Category "B" Organization entitled to use School District facilities under Policy No. 2020; and

(5) IT IS FURTHER ORDERED that defendants are hereby permanently enjoined from discriminating against recognized community organizations in the use of School District facilities during non-school hours on the grounds of the religious nature of the group's intended use; the use of School District facilities by such organizations shall be permitted by defendants on the same basis as if such use were not religious in character; and

(6) Defendants are hereby permanently enjoined from making selective or discriminatory administrative provisions regarding fees, supervisors, cash deposits, bonds, etc. for proposed uses of School District facilities by recognized community groups for religious purposes.

## ON MOTION FOR NEW TRIAL

On March 29, 1983, after a trial to the court, the court held that defendants had

created a public forum from which they could not exclude plaintiffs without violating the First Amendment to the Constitution of the United States. Judgment was entered in favor of plaintiffs and against defendants. The matter is now before the court on defendants' motion for a new trial and other relief. Having considered the matter fully, the court finds that the motion for a new trial, additional findings and conclusions and an amended judgment should be denied, except as hereinafter noted.

Defendants move the court to amend its findings of fact and conclusions of law to conform to the case of *Perry Education Assn. v. Perry Local Educators' Assn.,* —— U.S. ——, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The court has examined *Perry,* but finds that it presents no reason to change the findings or conclusions in the instant case. In *Perry,* a collective bargaining agreement with the Board of Education provided that Perry Education Association, but no other, would have access to the inter-school mail system and teacher mailboxes in the Perry Township school system. The issue in *Perry* was whether denying a rival organization access to teacher mailboxes violated the First and Fourteenth Amendments to the constitution.

The U.S. Supreme Court held that no constitutional violation was presented. The Court held that "[t]he First Amendment's guarantee of free speech applies to teacher's mailboxes as surely as it does elsewhere within the school, [cite omitted] and on the sidewalks outside." *Id.* at ——, 103 S.Ct. at 954. However, the First Amendment does not require "equivalent access to all parts of a school building." *Id..*

The Court held that because the school mail facilities were not open to the general public, no public forum was created. *Id.* at ——, 103 S.Ct. at 956. Because no public forum was created, "the school district had no 'constitutional obligation per se to let any organization use the school district mail boxes.'" *Id.* at ——, 103 S.Ct. at 957.

At this point, *Perry* parts company with our holding in this case. In *Perry,* no public forum existed. In the instant case, this court is presented with "public property which the state has opened for use by the public as a place for expressive activity. The constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place." *Id.* at ——, 103 S.Ct. at 955, *citing Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981).

Defendants claim the Shawnee Mission School District has created only a "limited public forum," and that plaintiffs can be excluded from this forum without violating the First Amendment. On pages 15–16 of the memorandum and order of March 29, 1983, this court recognized the limited nature of defendants' public forum. The facilities of the Shawnee Mission School District are open to the school district community for meetings and discussions during non-school hours, therefore those facilities have become a public forum for the community. Of course, it is a limited public forum. It is limited to recognized community groups. Community individuals are not allowed to use school district facilities for their individual pursuits. Non-community groups are not allowed to use the facilities either. The Court in *Perry* recognizes that groups may be excluded from a non-public forum based on their status, and the Court recognizes that status-based discrimination may be proper even in a public forum. *Id.* —— U.S. at ——, 103 S.Ct. at 956–57. Nothing in *Perry,* however, indicates that a public forum may be closed to groups based on the content of the group's intended speech.

*Perry* simply does not apply to a case involving a public forum. *Perry* is a "selective access" case like *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), in that there was no court finding or evidence in the record which demonstrated that permission to use teacher mailboxes had been granted as a matter of course to all who sought to distribute material. *Id.* —— U.S. at ——, 103 S.Ct. at 956. In the case before this court, there is ample evi-

dence that, given no objection to their proposed speech, all recognized community groups which sought permission to use defendants' facilities were granted such permission.

The U.S. Supreme Court's holding in *Perry* tells us no more than that a union which is the sole collective bargaining agent for a group of teachers may be granted the exclusive right of access to a non-public forum without infringing upon the First Amendment. *Perry* should not be read to allow content-based discrimination in a public forum.

With two exceptions, the court denies defendants' motion to amend the findings of fact and to make additional findings of fact. Some of the facts that defendants wish the court to adopt are cast in a light more favorable to defendants than the record warrants. The rest of the facts are either not necessary to the decision, or are matters which are not supported by the evidence. The court is not required to make findings on factual questions which are unnecessary to the result reached. *Immigration and Naturalization Service v. Bagamasbad*, 429 U.S. 24, 97 S.Ct. 200, 50 L.Ed.2d 190 (1976). This court's findings are clear, specific and complete enough to inform the parties and a reviewing court, if necessary, of the basis for its decision. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1186 (10th Cir.1975).

Finding of Fact No. 20 shall be amended to provide that Shawnee Mission West High School was used on two occasions instead of three by the Trinity Lutheran Church since 1969. Finding of Fact No. 37 shall be amended to state, "Country Hills is a 'church organization' and is considered a Category 'B' group under Policy No. 2020 for purposes of using the facilities of the School District." Further amendments to the findings of fact will not be made because the basis for the court's decision is clear in their absence.

The court is not persuaded that its conclusions of law are insufficient. Therefore, the court will deny defendants' proposed amendments to the conclusions of law.

Defendants also move the court for a new trial. The court has considered defendants' arguments: that *Perry Education Assn. v. Perry Local Educators' Assn., supra,* compels a different result; that the court erred in concluding a public forum exists in the defendants' facilities; that the court erred in concluding that plaintiffs were excluded from the School District facilities because of speech content; that the court failed to give credibility to testimony about the psychological effect of religion on children; that the court erred in concluding that an equal access policy would not expose the defendants to impermissible levels of religious entanglement; and others. The court finds no merit to these arguments and finds the motion for a new trial must be overruled.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion to amend the court's findings of fact and to make additional findings of fact is granted in part and denied in part.

IT IS FURTHER ORDERED that Finding of Fact No. 20 be amended to provide that Shawnee Mission West High School was used on two occasions instead of three by the Trinity Lutheran Church.

IT IS FURTHER ORDERED that Finding of Fact No. 37 be amended to read:

"Country Hills is a 'church organization' and is considered a Category 'B' group under Policy No. 2020 for purposes of using the facilities of the School District."

IT IS FURTHER ORDERED that defendants' motion to amend the court's conclusions of law is hereby denied.

IT IS FURTHER ORDERED that defendants' motion for a new trial is hereby denied.